Filed 2/16/17

# IN THE SUPREME COURT OF CALIFORNIA

ROY ALLAN SLURRY SEAL, INC., et al., )
)
   Plaintiffs and Appellants,  )
)      S225398
   v.        )
)   Ct.App. 2/8 B255558
AMERICAN ASPHALT SOUTH, INC.,  )
)    Riverside County
   Defendant and Respondent.  ) Super. Ct. No. RIC1308832
_____)

   To prove the tort of intentional interference with prospective economic advantage, a plaintiff must establish "the existence of an economic relationship with some third party that contains the probability of future economic benefit to the plaintiff." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1164 (*Korea Supply*).)  Here we decide whether such a relationship exists between a bidder for a public works contract and the public entity soliciting bids. Plaintiffs alleged that they had submitted the second lowest bids on several contracts awarded to defendant, and that their bids would have been accepted but for defendant's wrongful conduct during the bidding process.  A divided Court of Appeal panel found these allegations sufficient.  We reverse.  Public works contracts are a unique species of commercial dealings.  In the contracts at issue here, the public entities retained broad discretion to reject all bids.  The bids were sealed, and there were no postsubmission negotiations.  In awarding the contracts, the public entities could give no preference to any bidder based on past dealings,

1

and were required to accept the lowest responsible bid.  In these highly regulated circumstances, plaintiffs had "at most a hope for an economic relationship and a desire for future benefit."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 (*Blank*).)  Accordingly, plaintiffs' allegations were insufficient; the demurrer was properly sustained.

## I.  BACKGROUND

Between 2009 and 2012 defendant American Asphalt South, Inc. (American) outbid the plaintiffs, Roy Allan Slurry Seal, Inc. (Allan) and Doug Martin Contracting, Inc. (Martin) on 23 public works contracts to apply a slurry seal coating on various roadways in Los Angeles, San Bernardino, Riverside, Orange, and San Diego Counties. The total value of the contracts exceeded $14 million.  In 2013, Allan and Martin jointly sued American in all five counties for intentional interference with prospective economic advantage (hereafter sometimes referred to as tortious interference).[1]  Only the Riverside tort action is at issue here.

The Riverside complaint alleged that American won six public works contracts[2] on which either Allan or Martin was the second lowest bidder. American's underbids ranged from $3,842 to $140,794.  The complaint described the dates and amounts of American's bids, but did not include copies of the bids themselves.  The actual bids appear nowhere in the appellate record.

---

[1]    Plaintiffs also alleged predatory pricing under the Unfair Practices Act (Bus. & Prof. Code, §§ 17000, 17043) and sought an injunction against American's bidding practices under the unfair competition law (Bus. & Prof. Code, § 17200).  The trial court sustained demurrers to those causes of action, and the Court of Appeal affirmed.  Those holdings are not before us.

[2]    The contracting entities included four cities and the County of Riverside. For simplicity, we refer to these contracts collectively as the Riverside contracts.

To support their theory of tortious interference, plaintiffs alleged as follows. Together, plaintiffs had 60 years of experience handling public works projects for slurry seal repair and maintenance. The cost of materials for these projects is essentially the same for all contractors. American engaged in wrongful, fraudulent, and illegal conduct by submitting deflated bids because it failed to pay prevailing wage and overtime compensation in connection with the named contracts, and with other public works contracts during the same period. Plaintiffs alleged they had both a relationship with the contracting public entities and a reasonable probability of future economic benefit, because they "were the respective second lowest bidder[s] and would have been awarded the contract[s] but for the fraudulent and/or illegal conduct of [American] . . . ." According to the complaint, "[American]'s bid would have been rejected if [American]'s conduct in failing to pay its employees properly was made known to the [public entity,] and/or [American] would not have been able to submit a lower bid . . . if [American] was properly paying all of its employees the prevailing wages . . . ." Plaintiffs alleged that the failure to secure the Riverside contracts resulted in estimated lost profits of $168,511 for Allan and $269,830 for Martin.

The trial court sustained American's demurrer to the entire cause of action without leave to amend. On appeal, the appellate court majority reversed as to the tortious interference claim, concluding that plaintiffs' pleading was adequate: "Plaintiffs here alleged that as the second lowest bidders they would have been awarded the contracts but for American's interference. Implicit in this is the allegation that the various public entities were required to award the contract to the lowest responsible bidder and that plaintiffs satisfied all the requirements necessary to qualify for those contracts. Although plaintiffs here did not submit the lowest bids, that was alleged to be due solely to American's violation of its statutory obligation to pay its workers the prevailing wage. As in *Korea Supply*,

3

absent that alleged misconduct it was plaintiffs who in fact submitted the true and lawful lowest bids." The majority concluded that, although a public entity retains discretion to reject *all* bids submitted in response to its solicitation, "an actionable economic expectancy arises once the public agency awards a contract to an unlawful bidder, thereby signaling that the contract would have gone to the second lowest qualifying bidder."

The dissent urged to the contrary that plaintiffs failed to allege the existence of an economic relationship with the soliciting public entities. The dissent reasoned that the tort was meant to guard against interference with *existing* relationships. "[I]n the context of public works contracts, it is not possible for such a relationship to exist between the bidder and the public entity soliciting bids because public contract law forbids it." Moreover, "[i]t is antithetical to the principles of competitive bidding on public works projects that any bidder may expect probable future economic benefit . . . ." Because the award of a government contract is highly discretionary, "*none* of the bidders has a 'probability' of future economic benefit from the contract on which it is bidding." The dissent pointed out that timing is important. The relationship interfered with must be in existence when defendant's allegedly wrongful conduct took place. In the dissent's view, the majority went astray by relying on plaintiffs' subsequently discovered placement as the second-lowest bidder to posit a relationship that did not, and could not, have existed during the bidding process.

## II. DISCUSSION

A demurrer is properly sustained when "[t]he pleading does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.10, subd. (e).) On appeal, a resulting judgment of dismissal is reviewed independently. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) " ' "[W]e accept as true all the material allegations of the complaint" ' " (*Korea Supply*, *supra*, 29 Cal.4th at

4

p. 1141), but do not "assume the truth of contentions, deductions or conclusions of law" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967).

Intentional interference with prospective economic advantage has five elements: (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action. (*Korea Supply*, *supra*, 29 Cal.4th at pp. 1164-1165.)

Here we focus on the first element, and consider a question of first impression. Can a disappointed bidder on a public works contract demonstrate the requisite economic relationship with the public entity? The first element (hereafter the economic relationship element) has two parts: (1) an existing economic relationship that (2) contains the probability of an economic benefit to the plaintiff.

American argues that merely submitting a bid to a public entity does not create an existing relationship but rather the hope of one. It emphasizes that each bidder is considered a stranger to the public entity because the entity is prohibited from favoring bidders with whom it has had past dealings. Additionally, public entities have discretion to reject all of the bids submitted. Under these circumstances, American contends, there is no existing relationship with which to interfere and no reasonable probability that a benefit will be conferred by the awarding of a contract.

Plaintiffs counter that their act of submitting what would have been the lowest responsible bid but for American's wrongful interference in the bidding process demonstrates the existence of an economic relationship with the probability of future economic benefit. They rely on two facts. First, the public

5

entities were required to award the contracts to the lowest responsible bidder. Second, in each instance the entities actually awarded a contract rather than rejecting all bids. Accordingly, plaintiffs contend, their expectation was not unduly speculative. Defendant has the better argument.

Plaintiffs rely heavily on *Korea Supply*, *supra*, 29 Cal.4th 1134, but that case is distinguishable. There, the companies MacDonald Dettwiler and Lockheed Martin submitted bids to the Republic of Korea to provide military equipment. The plaintiff, Korea Supply, was a broker who represented MacDonald Dettwiler during the bidding process. The contract was awarded to Lockheed Martin after its agent allegedly bribed Korean officials. (*Id*. at pp. 1141-1142.) *Korea Supply* dealt primarily with the intent element of the tort. However, it also held that the economic relationship element had been adequately pled. (*Id*. at p. 1164.) The plaintiff's agreement with MacDonald Dettwiler fixed its commission at 15 percent of the contract price. The plaintiff would have been entitled to a $30 million commission had MacDonald Dettwiler won the contract. The economic relationship allegedly interfered with was *not* a relationship between the broker and the Republic of Korea, the soliciting entity. Instead, the relationship was that between the broker and MacDonald Dettwiler. That relationship was an existing one that arose before the bidding process began. (*Id*. at pp. 1141, 1164.) Under the agreement, the broker had a reasonable expectation that it would receive its defined future economic benefit but for Lockheed's alleged interference. Thus, the business relationship and corresponding expectancy was sufficiently alleged. (*Id*. at p. 1164.)

Plaintiffs argue that *Korea Supply* is quintessentially a case about losing bidders and that plaintiffs have an even stronger claim here because "Korea Supply Company was once removed from the bidding process and its stake in the matter was completely dependent upon the fortunes of MacDonald Dettwiler."

6

Significantly, however, there is no indication that the bidding process between MacDonald Dettwiler and the Republic of Korea, upon which the broker's commission depended, was constrained in a manner similar to the statutory rules that govern California public works contracts. As explained below, the public works bidding process differs significantly from the commercial transactions that traditionally formed the basis for tort liability. *Korea Supply* does not stand for the proposition that a public contract bidder has an existing relationship with the entity soliciting the bid.

*Buckaloo v. Johnson* (1975) 14 Cal.3d 815 (*Buckaloo*) is another case in which the economic relationship element was adequately pled.[3] That case involved a tortious interference claim in the real estate brokerage context. A property owner posted an " 'open listing' " soliciting local brokers to identify buyers for her property. (*Buckaloo*, at p. 820.) Plaintiff Buckaloo told a prospective buyer about the property and informed the seller that he was the " 'procuring cause' " of that buyer. (*Ibid*.) The buyer ultimately purchased the property without Buckaloo's participation. (*Id*. at pp. 820-821.) When he requested his commission, the seller refused to pay. Buckaloo sued the seller, the buyer, and others involved in the transaction; a demurrer was sustained as to all defendants but the seller. (*Id*. at p. 821.)

*Buckaloo* held the tort had been adequately pled even though the open listing was not a contract enforceable against the seller because of the statute of

---

[3]    *Buckaloo* was disapproved in part in *Della Penna v. Toyota Motor Sales, U.S.A., Inc*. (1995) 11 Cal.4th 376, 393, footnote 5 (*Della Penna*). The disapproved aspect of *Buckaloo*'s holding involved the "wrongful" act element of the tort (*Della Penna*, at p. 393), which is not at issue here.

frauds.[4]  (*Buckaloo*, *supra*, 14 Cal.3d at pp. 821-822.)  As *Buckaloo* explained, "the mere fact that a prospective economic relationship has not attained the dignity of a legally enforceable agreement does not permit third parties to interfere with performance."  (*Id*. at p. 827.)  The plaintiff had pled a "prospective contractual relationship" because the seller posted an open listing offering to pay brokers a commission.  Plaintiff reasonably understood this action to constitute an invitation to find a buyer.  (*Id*. at p. 828.)  The plaintiff alleged he had "completed the unilateral, albeit unenforceable, contract" with the seller by providing the necessary buyer.  (*Id*. at p. 829.)  The seller's posting of an open listing and the offer of a commission, on which Buckaloo relied in procuring a buyer, was sufficient to demonstrate an existing economic relationship between Buckaloo and the seller.  The complaint further alleged tortious interference:  the buyer knew of the seller's promise to pay, and intentionally interfered with the prospective commission by approaching the seller directly and inducing her to sell the property while intentionally excluding Buckaloo's participation.  (*Ibid*.)[5]

---

[4]     Civil Code section 1624, subdivision (a)(4) (formerly subd. 5) requires a writing subscribed by the party to be charged for "[a]n agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, . . . or to procure, introduce, or find a purchaser or seller of real estate . . . for compensation or a commission."

[5]     Citing *Buckaloo*, the Court of Appeal in *Settimo Associates v. Environ Systems, Inc.* (1993) 14 Cal.App.4th 842 (*Settimo*) described the economic relationship element as requiring "the existence of a *prospective* business relationship containing the probability of future economic rewards for plaintiff." (*Id*. at p. 845, italics added.)  Plaintiffs attribute significance to *Settimo*'s use of the word "prospective."  However, the court did not address the first element of the tort.  It held that the plaintiff had failed to state a cause of action because the winning bidder's lack of a general contracting license to perform some of the work called for by the contracts "does not amount to actionable unlawful interference with contracts." (*Id*. at p. 846.)  *Settimo* offers no guidance regarding the economic relationship element.

By contrast, a cause of action for tortious interference has been found lacking when either the economic relationship with a third party is too attenuated or the probability of economic benefit too speculative. In *Blank, supra*, 39 Cal.3d 311, the plaintiff alleged that the defendant had interfered with his application for a city license to operate a poker club. *Blank* held the plaintiff's pleading failed to satisfy the economic relationship element. "First, '[t]he relationship between [plaintiff] and the City cannot be characterized as an economic relationship. It was [plaintiff's] relationship to a class of as yet unknown [patrons] which was the prospective business relationship.' [Citation.]" (*Id*. at p. 330.) "Second, even if the relationship between the plaintiff and the city could be so characterized, it would make little difference. The tort has traditionally protected the expectancies involved in ordinary commercial dealings—not the 'expectancies,' whatever they may be, involved in the governmental licensing process." (*Ibid*.) Third, the city council's discretion to grant or deny a poker club license application was "so broad as to negate the existence of the requisite 'expectancy' as a matter of law. Thus, 'no facts are alleged . . . showing that the plaintiff had any reasonable expectation of economic advantage which would otherwise have accrued to him . . . .' [Citation.]" (*Ibid*.)

*Youst v. Longo* (1987) 43 Cal.3d 64 (*Youst*), held that the outcome of a sporting contest involving harness horseracing was too speculative to support a tortious interference claim. (*Id*. at p. 74.) The plaintiff alleged that the defendant had driven his horse into the path of the plaintiff's horse during a race and had struck plaintiff's horse with a whip, causing it to break stride and finish in sixth place. The plaintiff sought damages based on the purse for first, second, or third place, with the ultimate placement to be determined by the jury, along with punitive damages. (*Id*. at p. 68.) The trial court sustained defendant's demurrer without leave to amend. *Youst* affirmed, observing: "the true source of the

9

modern law on interference with prospective relations is the principle that tort liability exists for interference with *existing* contractual relations. [Citation.] 'For the most part the "expectancies" thus protected have been those of future contractual relations . . . . In such cases there is a background of business experience on the basis of which it is *possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered*.' " (*Id*. at p. 75, quoting Prosser & Keeton, Torts (5th ed. 1984) § 130, p. 1006, italics added by *Youst*.) By contrast, the tort "traditionally has not protected speculative expectancies such as the particular outcome of a contest." (*Youst*, at pp. 74-75.) The defendant's demurrer was therefore properly sustained because "[d]etermining the probable expectancy of winning a sporting contest but for the defendant's interference seems impossible in most if not all cases, including the instant case." (*Id*. at p. 75, italics omitted.)

In *Westside Center Associates v. Safeway Stores 23, Inc*. (1996) 42 Cal.App.4th 507 (*Westside Center*), the Court of Appeal interpreted our holdings in *Youst* and *Blank* to require proof that the defendant had disrupted a particular relationship with a known third party. There, the plaintiff purchased a shopping center containing several small stores. An "anchor" building in the center was separately owned and leased to Safeway. Safeway vacated the premises, but executed an option to renew its lease for five years. Business at the rest of the center suffered while the anchor premises stood vacant, and the plaintiff ultimately sold its property interest at a claimed loss of more than $2 million. (*Id*. at pp. 510-515.) The plaintiff sued Safeway for tortious interference with prospective economic advantage, alleging that Safeway interfered, not with a particular sale, but with the relationship between plaintiff and the class of all potential buyers for the property, thereby reducing its market value. (*Id*. at p. 523.) The Court of

10

Appeal upheld the trial court's dismissal of the claim.**6**  It reasoned that an
" 'interference with the market' " or " 'lost opportunity' " claim (*Westside Center*,
at p. 527) was unduly speculative:  "It assumes what normally must be proved,
i.e., that it is reasonably probable the plaintiff would have received the expected
benefit had it not been for the defendant's interference."  (*Id.* at p. 523.)
Emphasizing the requirement of an existing relationship, the court held that the
tort "protects the expectation that the relationship eventually will yield the desired
benefit, not necessarily the more speculative expectation that a potentially
beneficial relationship will eventually arise."  (*Id.* at p. 524.)  The court concluded
that the plaintiff's theory "fails to provide any factual basis upon which to
determine whether the plaintiff was likely to have actually received the expected
benefit.  Without an existing relationship with an identifiable buyer, [plaintiff]'s
expectation of a future sale was 'at most a hope for an economic relationship and a
desire for future benefit.' "  (*Id.* at p. 527, quoting *Blank*, *supra*, 39 Cal.3d at p.
331.)

These authorities counsel against recognizing an "economic relationship"
containing the "probability of future economic benefit" (*Korea Supply*, *supra*, 29
Cal.4th at p. 1164), solely because plaintiffs submitted a bid in response to a
public entity's solicitation.  First, as the dissent below observed, there could be no
existing relationship between plaintiffs and the public entities soliciting bids
"because public contract law forbids it."  The various public entities named in the
Riverside County action were required by statute to award these contracts to the
lowest responsible bidder.  (See Pub. Contract Code, §§ 20162 [city contracts],

---

**6**     The dismissal occurred, not on demurrer, but instead after questions of law
and stipulated facts were presented to the trial court in pretrial proceedings.
(*Westside Center*, *supra*, 42 Cal.App.4th at p. 510.)

11

20128 [county contracts], 10122 [state contracts].)  The purpose of this requirement is to " 'guard against favoritism, improvidence, extravagance, fraud and corruption . . . .' " (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173 (*Domar Electric*); accord, Pub. Contract Code, § 100.)  Under the law, each bidder must be treated as a stranger to the entity.  Thus, unlike *Korea Supply*, where the plaintiff had an ongoing agency relationship with the losing bidder, no past or ongoing dealings could affect the award of these public contracts.  The entities were required to award the contract to the lowest responsible bidder, or not at all.

Second, plaintiffs "ha[ve] pleaded and can plead no protectible 'expectancy.' " (*Blank*, *supra*, 39 Cal.3d at p. 331.)  A public entity's solicitation for bids is merely a request for offers from interested parties.  It encourages multiple parties to compete for the contract.  (*Domar Electric*, *supra*, 9 Cal.4th at p. 173; *Konica Business Machines U.S.A., Inc. v. Regents of the University of California* (1988) 206 Cal.App.3d 449, 456.)  Here, the bidding was sealed, and no negotiations took place.  (See Pub. Contract Code, §§ 20170 [city contracts], 20129, subd. (a) [county contracts], 10167 [state contracts].)  Ultimately, the public entities had broad discretion to reject all bids.  (*Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 152; Pub. Contract Code, §§ 20166 [city contracts], 20150.9 [county contracts], 10185 [state contracts].)  Just as the city's discretion to grant or deny a poker club license defeated the plaintiff's expectancy in *Blank*, here too, plaintiffs had "at most a hope for an economic relationship and a desire for future benefit." (*Blank*, *supra*, 39 Cal.3d at p. 331.)

In reaching a contrary conclusion, the Court of Appeal majority reasoned that "an actionable economic expectancy arises *once the public agency awards a contract* to an unlawful bidder, thereby signaling that the contract would have gone to the second lowest qualifying bidder." (Italics added.)  The court found

12

"implicit" in plaintiffs' allegations "that plaintiffs satisfied all the requirements necessary to qualify for those contracts." It further concluded that, "[a]lthough plaintiffs here did not submit the lowest bids, that was alleged to be due solely to American's violation of its statutory obligation to pay its workers the prevailing wage." It observed that "[w]hether a plaintiff was in fact the second lowest bidder and would have been awarded a contract had the winning bidder complied with the prevailing wage law is a factual issue susceptible to standard civil discovery practices and is amenable to proof at trial."

The majority's analysis puts the cart before the horse. The case law recognizes that "the interference tort applies to interference with *existing* noncontractual relations which hold the promise of future economic advantage." (*Westside Center*, *supra*, 42 Cal.App.4th at p. 524, citing *Blank*, *supra*, 39 Cal.3d 311 and *Youst*, *supra*, 43 Cal.3d 64.) The tort's requirements "presuppose the relationship existed *at the time* of the defendant's allegedly tortious acts lest liability be imposed for actually and intentionally disrupting a relationship which has yet to arise." (*Westside Center*, at p. 526, italics added.) As the dissent observed, "the plaintiff's 'expectancy' must necessarily precede the interfering conduct." (See, e.g., *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 243.) Here, when American allegedly submitted illegally deflated bids, plaintiffs were only one of several bidders on these public works contracts. No one knew if plaintiffs would be the lowest bidder, and the public entities had not yet decided whether or not to award the contracts. Plaintiffs cannot rely on the outcome of *later* events to prove that American interfered with an *existing* economic relationship.

The majority's probable benefit analysis is also speculative. The tort of intentional interference with prospective economic advantage "traditionally has not protected speculative expectancies" (*Youst, supra*, 43 Cal.3d at pp. 74-75),

13

usually because " '*there is no sufficient degree of certainty that the plaintiff ever would have received the anticipated benefits*' " (*id.* at p. 74, quoting Prosser & Keeton, Torts, *supra*, § 130, p. 1006, italics added by *Youst*.)  Accordingly, "[w]e have been cautious in defining the interference torts, to avoid promoting speculative claims." (*Pacific Gas & Electric Co. v. Bear Sterns & Co.* (1990) 50 Cal.3d 1118, 1136-1137.)  *Buckaloo*, *supra*, 14 Cal.3d 815, stated that the tort lies " 'when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor . . . .' " (*Id.* at p. 823, fn. 6, quoting *Builders Corporation of America v. U.S.* (N.D.Cal. 1957) 148 F.Supp. 482, 484, fn. 1.) *Youst* stated a slightly lower threshold:  California authority "requir[es] at least the reasonable probability of an expectancy to establish a cause of action for interference with prospective economic advantage . . . ." (*Youst*, at pp. 71-72; accord, *Korea Supply*, *supra*, 29 Cal.4th at p. 1164 [plaintiff must "demonstrate an economic relationship with a probable future economic benefit"].)  *Youst* emphasized that this requirement "is especially appropriate to evaluate a lost economic expectancy where the facts involve a competitive contest of one kind or another.  To require less of a showing would open the proverbial floodgates to a surge of litigation based on alleged missed opportunities to win various types of contests, despite the speculative outcome of many of them." (*Youst*, at p. 74.)

We have previously noted, in a different context, the inherently speculative nature of public works bidding. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 315-316 (*Kajima*).) In denying recovery against a government entity for lost profits under a promissory estoppel theory, *Kajima* stated:  "Because the [public entity] was authorized to reject all bids, [the plaintiff] did not know at [the time its bid was submitted] whether the contract would even be awarded.  Nor, because of the secrecy of the bidding process, did [the plaintiff] know whether it was indeed the

14

lowest responsible bidder.  Therefore, given these uncertainties which are inherent in competitive bidding, bid preparation costs, not lost profits, were the only costs reasonably incurred." (*Ibid*.)

Plaintiffs' allegations of tortious interference likewise hinge on a high degree of uncertainty.  Contrary to the majority's reasoning below, the award of contracts to American does not "signal[] that the contract would have gone to the second lowest qualifying bidder."  As amicus curiae League of California Cities observes, even if a public entity accepts the lowest bid, it retains discretion to reject all *remaining* bids if the contract is not consummated with the low bidder. (See Pub. Contract Code, § 20174 ["[t]he city council *may*, on refusal or failure of the successful bidder to execute the contract, award it to the next lowest responsible bidder" (italics added)].)  Notably, in at least two of the contracts at issue here, American underbid plaintiffs by over $100,000.  The public entities' discretion to reject remaining bids would necessarily take into account the difference between the bid amounts of the lowest and second lowest bidders.

Additionally, to be awarded the contracts, plaintiffs were required to meet the criteria for responsible bidders and responsive bids.  (Pub. Contract Code, § 1103 [defining responsible bidder]; *MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 368 (*MCM Construction*) [defining responsive bid].)  Determining whether a certain bidder is "responsible" generally entails an evaluation of the bidder's trustworthiness, quality, fitness, capacity, and experience to satisfactorily perform the contract in question.  (Pub. Contract Code, § 1103; *City of Inglewood-L.A. County Civic Center Auth. v. Superior Court* (1972) 7 Cal.3d 861, 867.)  It "is a complex matter dependent, often, on information received outside the bidding process and requiring, in many cases, an application of subtle judgment."  (*Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1341-1342.)  Given "the complex and

15

external nature of a determination of nonresponsibility" (*id*. at p. 1342), it is speculative for plaintiffs to allege, as a basis for the economic relationship, that they "were the respective second lowest bidder and would have been awarded the contract" if not for American's illegal conduct.

For these reasons, the public works bidding process differs from the types of commercial transactions that traditionally have formed the basis for tort liability. In ordinary commercial transactions, " 'there is a background of business experience on the basis of which it is *possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered.*' " (*Youst*, *supra*, 43 Cal.3d at p. 75, quoting Prosser & Keeton, Torts, *supra*, § 130, at p. 1006, italics added by *Youst*.) By contrast, in these public works contracts, the bidding was sealed, there were no negotiations, all qualified contractors were on equal footing regardless of past contractual dealings, the public entities were required to determine the bidder's responsibility, and they retained discretion to reject all bids. These circumstances counsel against extending a tortious interference claim to the bid process for these public works contracts.

Additionally, we must consider whether expanding tort liability in the area of public works contracts "would ultimately create social benefits exceeding those created by existing remedies for such conduct, and outweighing any costs and burdens it would impose." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 8.) Courts must act prudently when fashioning damages remedies "in an area of law governed by an extensive statutory scheme." (*Kajima*, *supra*, 23 Cal.4th at p. 317.) In California, public contract bidding is largely governed by statute. (*Id*. at p. 313.) As noted, the public entity is required to determine whether a bidder is responsible and the bid is responsive. (Pub. Contract Code, § 1103; *MCM Construction*, *supra*, 66 Cal.App.4th at p. 368.)

16

Competing bidders may challenge the award of a contract to an irresponsible bidder by a writ of mandate for injunctive relief. (*Kajima*, at p. 313, fn. 1; *DeSilva Gates Construction, LP v. Department of Transportation* (2015) 242 Cal.App.4th 1409, 1421; *Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1414; Code Civ. Proc., § 1085.)

Plaintiffs argue that their lawsuits will protect employees on public works projects by uncovering and deterring wage law violations. The argument fails for two reasons. First, the area is already extensively regulated. (See Lab. Code, §§ 1726, 1727, 1741, 1773.2, 1775, 1776.) Prevailing wages are required by statute to be paid on all public works contracts. (Lab. Code, § 1771; *Alameda County Joint Apprenticeship & Training Committee v. Roadway Electrical Works Inc.* (2010) 186 Cal.App.4th 185, 190.) Several statutory mechanisms exist to enforce that duty. A public entity may withhold payments to a contractor who violates the prevailing wage laws. (Lab. Code, §§ 1726, subds. (a), (b), 1727.) The Division of Labor Standards Enforcement may recover wages, interest, and damages on behalf of employees through an administrative hearing process and a civil action. (Lab. Code, §§ 1741, 1775; *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 986.) The affected employees also possess private rights of action arising from statute and contract. (*Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 774 & fn. 13.) Notably, none of these statutory schemes contemplates damage awards to a disappointed public works bidder who alleges the winning bid was based on prevailing wage violations.[7]

---

[7] In 1991 the Legislature enacted Public Contract Code sections 19102 and 20104.70. Those sections authorize the second lowest public contract bidder and others to sue a successful bidder for damages upon proof that the contract was

*(footnote continued on next page)*

17

Second, the competitive bidding laws were enacted for the benefit of the public, " ' "not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest." ' " (*Kajima*, *supra*, 23 Cal.4th at pp. 316-317.) "The duties created by the wage-and-hour statutes run solely from employer to employee." (*Castillo v. Toll Bros., Inc.* (2011) 197 Cal.App.4th 1172, 1210.) They "do not create any action for civil damages in a competing bidder." (*Settimo*, *supra*, 14 Cal.App.4th at p. 846.)

Expanding tort liability to cover wrongful interference with the public contracts bid process would provide little additional benefit in light of the extensive statutory scheme. Conversely, an expansion has potentially significant public policy disadvantages. (See *Youst*, *supra*, 43 Cal.3d at pp. 77-78.) The possibility of significant monetary gain may encourage frivolous litigation by second lowest bidders " 'for effort they did not make and risks they did not take.' " (*Kajima*, *supra*, 23 Cal.4th at p. 317, quoting *City of Atlanta v. J.A. Jones Const. Co*. (Ga. 1990) 398 S.E.2d 369, 371.) That litigation, in turn, may deter responsible bidders from participating in the process, thus undermining the Legislature's goal of "stimulating competition in a manner conducive to sound fiscal practices." (Pub. Contract Code, § 100, subd. (c).) Such a result would directly contravene the principles underlying the tort of intentional interference

---

*(footnote continued from previous page)*

obtained through violations of the laws concerning workers' compensation and unemployment insurance. The statutes require criminal convictions as a prerequisite to the civil suit. (Pub. Contract Code, §§ 19102, subd. (a)(1), 20104.70, subd. (a)(1).) Prevailing wage violations are not mentioned in the statutes. (See also Lab. Code, § 1750.)

18

with prospective economic advantage:  carefully drawing "lines of legal liability in a way that maximizes areas of competition free of legal penalties."  (*Della Penna*, *supra*, 11 Cal.4th at p. 392.)  Additionally, although the public entities cannot be sued for lost profits (see *Kajima*, *supra*, 23 Cal.4th at pp. 315-316), they would likely be called upon as witnesses and subjected to potentially voluminous document requests under the Public Records Act.  Such litigation would risk draining government resources, and potentially interfere with the public's interest in having contracts awarded and performed promptly.  "[I]t is incumbent on this court to consider the broad-ranging social consequences of the chosen remedy," including whether "[a]llowing recovery of lost profits whenever a contract is wrongfully denied 'could drain the public fisc . . . .' "  (*Kajima*, at pp. 317-318.)  The costs of recognizing a tort remedy in this context are simply too high.

## III.  DISPOSITION

We reverse the judgment of the Court of Appeal, and remand with directions that the original order sustaining the demurrer be reinstated.


**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 234 Cal.App.4th 748
**Rehearing Granted**

_____

**Opinion No.** S225398
**Date Filed:** February 16, 2017

_____

**Court:** Superior
**County:** Riverside
**Judge:** Richard J. Oberholzer*

_____

**Counsel:**

Doyle & Schafer, Doyle Schafer McMahon, Daniel W. Doyle and David Klehm for Plaintiffs and Appellants.

Altshuler Berzon, Scott A. Kronland and Stacey M. Leyton for State Building and Construction Trades Council of California, AFL-CIO as Amicus Curiae on behalf of Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, Scott K. Dauscher, Paul G. Szumiak and Jennifer D. Cantrell for Defendant and Respondent.

Jarvis, Fay, Doporto & Gibson, Claire M. Gibson and Christine L. Crowl for League of California Cities as Amicus Curiae.

*Retired judge of the Kern Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David Klehm
Doyle Schafer McMahon
100 Spectrum Center Drive, Suite 520
Irvine, CA  92618
(949) 727-7077

Stacey M. Leyton
Altshuler Berzon
177 Post Street, Suite 300
San Francisco, CA  94108
(415) 421-7151

Paul G. Szumiak
Atkinson, Andelson, Loya, Ruud & Romo
12800 Center Court Drive South, Suite 300
Cerritos, CA  90703-9364
(562) 653-3200