Filed 10/1/21  Roumi v. Cal. Institute of Technology CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| FARSHID ROUMI et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA INSTITUTE OF TECHNOLOGY et al., <br><br> Defendants and Respondents. | B296273, B301541 <br><br> (Los Angeles County Super. Ct. No. BC654132) |

APPEALS from judgments of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Greene Broillet & Wheeler, Mark T. Quigley, Christian T. F. Nickerson; Esner, Chang & Boyer, Stuart B. Esner and Kevin K. Nguyen for Plaintiffs and Appellants.

Hueston Hennigan, John C. Hueston, Moez M. Kaba, Michael H. Todisco and Joseph A. Reiter for Defendants and Respondents.

A jury determined that respondent California Institute of Technology (Caltech) did not retaliate against appellant Farshid Roumi. (Lab. Code, § 1102.5.)[1] Substantial evidence supports the jury's finding that Caltech did not discharge or take adverse employment action against Roumi, whose temporary position at Caltech was tied to a federal grant. When the grant ended, his position ended. We also uphold the court's pretrial summary adjudication rulings. We affirm.

## FACTS AND PROCEDURAL HISTORY

After earning a PhD. in mechanical engineering, Roumi was appointed as a postdoctoral scholar at Caltech in 2011 for a series of fixed terms that varied from a few months to one year. His final appointment was in 2013. Roumi never joined Caltech's faculty. His faculty sponsor was respondent Michael Hoffmann, a research scientist and engineer who has been at Caltech for over 35 years. Roumi used Hoffmann's laboratory.

Caltech protects intellectual property developed on campus. In 2011, Roumi disclosed his idea for a battery system to Caltech. Caltech applied for a patent. Roumi signed an agreement stating that he must disclose any invention arising from his use of

---

[1] "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information . . . to a government or law enforcement agency" if the employee has reasonable cause to believe the information shows a violation of law. Nor may an employer or person acting on the employer's behalf retaliate against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or . . . rule or regulation." (Lab. Code, § 1102.5, subds. (b), (c).) Undesignated statutory references are to the Labor Code.

Caltech facilities. He agreed to "assign [his] entire right, title, and interest in and to such inventions" to Caltech.

In 2014, Roumi sought Department of Energy (DOE) funding to develop the battery system concept Caltech had patented. The application was submitted by Roumi's company, appellant Parthian Energy LLC (Parthian). Roumi told DOE that Caltech would contribute $150,000. Appellants applied to DOE without Caltech's knowledge or approval, violating Caltech policies requiring preapproval for funding requests.

In August 2014, DOE informed Roumi that his application was selected. He then disclosed the application to Caltech. Caltech told Roumi he had the option to leave Caltech and keep the DOE award; however, if Roumi left, Caltech would not pay $150,000 for cost sharing.

In November 2014, Roumi transferred the DOE award from Parthian to Caltech. Caltech submitted a revised proposal to DOE showing Caltech as the sole recipient of the award. Caltech retained all intellectual property rights created in connection with the proposed battery project.

In December 2014, Caltech and DOE entered an agreement (Agreement) for the battery project (Project). Roumi and Parthian are not parties to the Agreement. DOE committed $591,364 to complete the Project in two budget periods. Milestones had to be reached in the first budget period to obtain funding for the second budget period; DOE had sole discretion to determine if milestones were reached. The Agreement made Caltech responsible for cost sharing in the amount of $150,000.

On January 16, 2015, Caltech changed Roumi's status from postdoctoral scholar to "staff." Its letter to Roumi states (1) "your temporary position is expected to end on November 30, 2016";

(2) "This is not a contract of employment"; and (3) "your position may end at any time, with or without cause or notice—and your employment terminated—before the expected end date." His position was tied to the DOE grant.

Hoffmann was the Project principal investigator. As coprincipal investigator, Roumi conducted research, gathered data, supervised research assistants, and prepared reports. In February and April 2015, Roumi selected research assistants Zarui Chikneyan and Laleh Kasmaee. They soon complained of a hostile environment, saying Roumi bullied, maltreated, and insulted them, provided no coaching, constantly changed their assignments, and imposed arbitrary deadlines. Caltech counseled Roumi about his behavior in June 2015 and decided that he should not directly supervise the two women.

Though Roumi claimed he worked consistently on the Project, researchers "never" saw him in the lab. Multiple witnesses testified that Roumi was required to spend all his time on the Project because his salary was funded by DOE. Roumi admittedly worked on multiple battery ideas and did not spend all his time on the DOE Project.

Further disputes arose. Roumi accused Caltech of misusing DOE money to pay his assistants after they stopped working on the Project. After an audit was conducted, Caltech informed DOE that there was no evidence of mischarging. Kasmaee testified that she and Chikneyan worked on the Project until the end of June 2015. E-mails show Roumi assigned them research in May and asked for their reports in June, rebutting his claim that they stopped working in April 2015.

Roumi's relationship with Hoffmann deteriorated. In July 2015, Hoffmann told Roumi—after observing that Roumi "failed

4

to show up for work on campus for almost a month"—that he could no longer serve as faculty sponsor; Roumi had to find another sponsor or leave Caltech. Professor Morteza Gharib agreed to become Roumi's faculty sponsor.

Roumi accused Hoffmann of research misconduct, defined in Caltech's policy manual as "fabrication, falsification or plagiarism in proposing, performing, or reviewing research, or in reporting research results." Roumi claimed Hoffmann asked him to submit "old and unrelated" data to DOE in a progress report. Caltech investigated Roumi's claim and concluded that no misconduct occurred. Instead, material was cited from Roumi's PhD. thesis as a foundation to explain new concepts being explored on the Project. Hoffmann directed Roumi to "put together a report including the material from your thesis . . . along with the early research results." Roumi agreed that his thesis was the basis for the Project.

Caltech investigated Roumi's claim that Hoffmann retaliated against him for being a whistleblower and denied him access to a lab to research the Project. The claim was rejected. Caltech informed Roumi in writing that he was "never banned from using the lab" and instructed him to go there to complete the work specified in the Agreement by the DOE deadline. Roumi testified that he did not return to the lab after July 20, 2015, because "I wanted something different."

In November 2015, Caltech informed DOE that it found no wrongdoing regarding Roumi's complaints of (1) mischarging DOE for the salaries of Chikneyan and Kasmaee, (2) research misconduct by Hoffmann, and (3) retaliation against Roumi by banning him from the lab. DOE wrote Roumi that it "consider[ed] the matter resolved and will take no further action."

5

Caltech arranged for Roumi to have his own lab space and assigned him an experienced technical advisor to help move the Project along. Caltech gave Roumi mentoring and coaching to succeed in his interactions with others. The purpose of these efforts was to help Roumi meet DOE milestones. Roumi told DOE the new lab was "fully operational with all equipment needed."

Caltech hired two new research assistants to work on the Project, John Thorne and Saad Azam. Both men said Roumi was difficult to work with, set unrealistic deadlines, and constantly changed their assignments. Thorne testified that Roumi was disrespectful and threatened to have him deported. Roumi seldom came to work or met with researchers, even as DOE deadlines loomed.

In November 2015, DOE and Caltech amended the Agreement to extend the first budget period by six months, until May 2016. Dr. Gharib was the Project's principal investigator and Roumi remained the coprincipal investigator. Roumi and Hoffmann had no further interaction after December 2015.

Roumi claimed it was "impossible" for him to make progress on the Project, so he focused instead on his non-DOE work. In May 2016, Roumi asked DOE to continue the Project. DOE required fabrication and testing of a battery by mid-2016.

DOE evaluated Roumi's application and refused to authorize a continuation. Its letter states, "Budget Period 1 objectives and milestones have not been satisfactorily achieved." Dr. Gharib tried to convince DOE to continue, noting that it was "embarrassing to say we failed." There was no mechanism to appeal DOE's decision.

Roumi sought to refute DOE's statements about the lack of progress on the Project. He repeatedly e-mailed DOE, saying "it is not right that 3 researchers lose their jobs after working extremely hard to meet all the milestones." On July 22, 2016, DOE informed Caltech that the Project was canceled. DOE and Caltech invested $950,000 before the Project ended.

On July 26, 2016, Caltech ended Roumi's assignment, along with researchers Thorne and Azam, explaining that DOE had stopped funding the Project. The positions were contingent on DOE funding. Hoffmann was not involved in the elimination of positions funded by DOE.

Caltech informed Roumi that it could help him explore other employment opportunities. Roumi never applied for other positions at Caltech. After Roumi left, Caltech gave him equipment worth $160,000 so he could continue working on his battery project and spent $10,000 to move it to his new location.

In 2018, Caltech and Parthian entered a license agreement for Roumi's battery technology. Caltech granted Parthian a license to make and sell battery products under Caltech's patent.

**Appellants' Lawsuit**

In 2017, appellants sued Caltech and Hoffmann. Roumi alleged that he was "an employee, agent, joint venture[r], and/or independent contractor" at Caltech who reported "illegal, unethical, and fraudulent activity" at Caltech, including research misconduct and misuse of federal funds. He claimed respondents harassed, excluded, humiliated, intimidated and retaliated against him for his whistleblowing activity, obstructed his career opportunities, and wrongfully terminated him.

The lawsuit alleged a violation of section 1102.5; wrongful termination; breach of the implied covenant of good faith and fair

7

dealing; interference with prospective economic advantage; interference with contractual relations; and breach of an implied-in-fact contract.

## Summary Judgment Motions

Respondents brought motions for summary judgment in 2018. The court granted summary judgment for Hoffmann. It denied Caltech's motion for summary judgment; however, it adjudicated in Caltech's favor causes of action for breach of the implied covenant of good faith and fair dealing; tortious interference with contractual relations and prospective economic advantage; breach of an implied-in-fact contract; and an accounting. The court rejected Parthian's claims. On March 1, 2019, a final judgment was entered in favor of Hoffmann and against Parthian.

## The Jury Verdict

Roumi had a month-long trial on his remaining claim against Caltech for violating section 1102.5. The parties jointly created the special verdict form. After three hours of deliberation, the jury returned a unanimous verdict for Caltech. Roumi did not seek clarification of the verdict before jurors were discharged.

The jury found: (1) Caltech was Roumi's employer; (2) Caltech believed Roumi disclosed or might disclose that Hoffmann directed him to submit a report to DOE with old or unrelated information or Hoffmann or Caltech misused federal funding; (3) Roumi refused to submit a report to DOE with old or unrelated information or refused to misuse federal funding; (4) he had cause to believe his participation in such misconduct would violate federal law; and (5) Caltech did not "discharge or take

8

other adverse employment action against Roumi."[2]  The court entered judgment for Caltech.

## Motion For New Trial

Roumi moved for a new trial.  He asserted that the jury's finding on question 5—that Caltech did not discharge him—was contrary to the great weight of evidence.  He cited a missive from Caltech informing him that DOE "funding under which you are working is not being continued.  As a result, your assignment with Caltech is being terminated."  Because the jury was instructed not to answer questions 6 through10 on the verdict form, it did not decide if Caltech discharged him because DOE stopped funding or in retaliation for his protected conduct.

The court denied the motion for new trial.  It found "there was substantial, credible evidence to support the jury's verdict."  Documentary evidence and trial testimony show Caltech created a temporary position for Roumi, "lasting only for the duration of the DOE grant and depend[ing] on the availability of DOE funding."  When DOE terminated the grant in July 2016, three positions funded by the grant, including Roumi's, came to their natural conclusion.

---

[2] After answering "no" to question 5, the jury did not reach the remaining questions:  (6) was Roumi's disclosure or refusal to participate in federal law violations a contributing factor in Caltech's decision to discharge him; (7) did Caltech cause Roumi harm; (8) would Caltech have discharged Roumi anyway for legitimate, independent reasons; (9) did Caltech take other adverse employment actions against Roumi; (10) would Caltech have taken other adverse employment actions for legitimate, independent reasons; (11) and (12) damages.

**Appeals**

An appeal was taken from the judgment for Hoffmann on March 8, 2019. A second appeal was taken from the judgment for Caltech on October 3, 2019, after the court denied Roumi's motion for new trial. The appeals were consolidated for purposes of briefing, argument, and decision.

**DISCUSSION**

### 1. Sufficiency of the Evidence

Roumi challenges the jury's finding that Caltech did not "discharge or take other adverse employment action" against him. Applying customary rules of appellate review, we conclude that substantial evidence supports the finding. "[W]e are bound by the rule that when 'a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503.)

We review the record in the light most favorable to the judgment, presume the existence of every fact the jury could reasonably deduce from the evidence, resolve evidentiary conflicts in favor of the findings, and do not reassess witness credibility. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

To show retaliation under section 1102.5, a plaintiff must prove (1) he engaged in protected activity; (2) defendant subjected plaintiff to an adverse employment action; and (3) a causal link between the first two factors. (*Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 592.) The jury found Caltech did not subject Roumi to an adverse employment action. He did not convince the jury there was a nefarious reason for his departure from Caltech.

10

After signing the Agreement, Caltech changed Roumi's status from postdoctoral scholar to "staff." In a letter, it informed him that his "temporary position" "may end at any time, with or without cause or notice." The letter was sent long before Roumi accused respondents of mischarging DOE, research misconduct, or retaliation. Trial testimony supports a conclusion that Roumi's position ended because DOE funding ended. Multiple Caltech employees attested that DOE funding lapsed and denied Roumi was "fired." The testimony of one credible witness is substantial evidence sufficient to support a factual finding. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

Dr. Gharib testified that Roumi "wasn't fired, it was the end of the project because funding was over, we didn't have any funding so . . . we had to dismantle the team." An engineering administrator testified, "Dr. Roumi wasn't fired. He was laid off because we lost funding." The director of research compliance stated that Roumi "was laid off because the DOE project ended." The director of human resources testified that Roumi stopped working at Caltech when the Project was canceled because "all the positions that were affiliated with that were eliminated." The engineering division chairman said Roumi left because "[h]is employment at Caltech was tied to the DOE funding." The vice-president of human resources said Roumi left Caltech because DOE "funding was exhausted."

Roumi knew his position would end when DOE ended the Project. He wrote to DOE in July 2016 that without its funding, "Three Caltech employees are going to lose their jobs." As Roumi anticipated, Caltech laid off Roumi, Thorne, and Azam when DOE terminated funding.

11

### 2.  Caltech's Liability Was Not a Legal Question

Roumi asserts, "Caltech's conduct was an adverse employment action as a matter of law."  He is mistaken.  He asked the jury to make a *factual* finding, inviting the panel to weigh the facts and find in his favor on this element of the tort.  He did not request a directed verdict at trial—with good reason, because the evidence was in dispute.

The instructions set forth the factual dispute.  They state, "Roumi claims that Caltech discharged or took other adverse employment actions against him in retaliation for his disclosure of information of an unlawful act or refusal to participate in an unlawful act."  "Roumi must prove that he was subjected to an adverse employment action.  Adverse employment actions are not limited to ultimate actions, such as termination or demotion" but can also include conduct that materially and adversely affect employment, although "minor or trivial actions or conduct that is not reasonably likely to do more than anger or upset an employee cannot constitute an adverse employment action."

In closing argument, Roumi addressed question 5 on the verdict form.  His counsel said, "[Y]ou're going to be asked, 'did the defendants engage in adverse conduct and/or discharge?' They're separate.  You can find that they discharged him legitimately, but still look at all the other things they did and still find in favor of the plaintiff, the kicking out of the lab, not appealing, filing all the late reports, not giving him the financials.  If you find that those are adverse events connected to his report of Dr. Hoffmann, you can still make a finding for the plaintiff, even if you find that the discharge was justified."

After weighing the evidence, the jury found Roumi failed to prove discharge or an adverse employment action.  He now seeks

12

to recast the issue as one of law, though his posttrial motion did not suggest this was a legal issue. Instead, he said a new trial is warranted because "the jury's answer to verdict question 5 (the sole basis for its verdict) was against the great weight of the evidence."

Roumi denies that the verdict form was confusing or that jurors misunderstood question 5. He instead argues that the jury's verdict is against "uncontroverted" evidence. However, the opening brief does not cite all material evidence from the 17 volumes of reporter's transcript: It over-relies on Roumi's testimony, which was refuted by many witnesses. Reviewing courts presume the record contains evidence sustaining every finding of fact. An appellant must set forth *all* material evidence, not merely the facts favoring himself; otherwise, the court may treat the substantial evidence issue as waived. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

Roumi asserts that his work at Caltech was not dependent on the Agreement. This ignores ample testimony, cited in part 1, *ante,* that his position was tied to DOE funding. Roumi admittedly worked on matters unrelated to the Project while being funded by DOE; an assistant testified that Roumi "never" came to the lab. DOE determined that milestones were not satisfactorily achieved and terminated funding. The jury could find that Caltech did not take adverse action; rather, DOE's unilateral decision to end the Project for lack of achievement caused Roumi's position to expire by its terms.

The record does not support Roumi's claim that Caltech "cause[d] or orchestrate[d] the nonrenewal of the DOE contract."

13

The DOE grant ended because Roumi failed to meet milestones. Researchers were hired to help him succeed but he did not coach them or manage their work, constantly changed their assignments, set arbitrary deadlines, and maltreated them. He was absent from work. There is no proof that Caltech instructed or encouraged DOE to end the Project. On the contrary, principal investigator Gharib wrote DOE urging it to reconsider its decision to terminate Project funding; he testified that the failure of the Project was "embarrassing."

Roumi suggests that Caltech could not end its relationship with him after DOE terminated Project funding. The record does not support a conclusion that Caltech had to keep Roumi on staff after DOE funding ended. Roumi was not a faculty member. He had a series of "scholar" appointments, then had a position that tracked the term of the Project. Roumi cannot bootstrap brief appointments and a temporary position into a promise of continued or indefinite employment. He did not prove he had a right to work at Caltech.

The record shows Caltech investigated Roumi's complaints. It supported him with coaching and assistance it did not give others, to help him succeed. Caltech had a financial stake in the success of the Project: It owns the intellectual property rights, invested hundreds of thousands of dollars in the Project, and equipped a new lab for Roumi. Caltech had no incentive to have the Project fail. After DOE funding ended, Caltech gave Roumi $160,000 in equipment for a lab to continue his research and granted Parthian a license to make batteries under Caltech's patent, showing that Caltech *still* wants appellants to succeed.

The record shows Roumi insulted, bullied, threatened, and mismanaged the four researchers he selected. Though his salary

14

was funded by DOE, he did not come to the lab to work on the Project as DOE deadlines approached, choosing to work on other matters. Given the evidence that Roumi sabotaged the Project—not respondents—it is not reasonably likely the jury would have found in his favor, even had it answered "yes" to question 5. There is no miscarriage of justice requiring reversal. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

### 3. Ruling on Summary Judgment

An intermediate order summarily adjudicating claims is reviewable after entry of final judgment. (Code Civ. Proc., § 906; *Jennings v. Marralle* (1994) 8 Cal.4th 121, 128.) We review de novo the court's summary adjudication of appellants' claims. Respondents bear the initial burden of showing that there is no triable issue of act and they are entitled to judgment as a matter of law. Appellants must then show a triable issue of material fact. (Code Civ. Proc., § 437c; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

### a. Tortious Interference Claim

The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and a third party with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) harm to the plaintiff proximately caused by the defendant. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 330 (*Blank*); *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512 (*Roy Allan*).)

Appellants allege that they had "economic relationships and had prospective economic advantages with the [DOE] that

15

resulted in economic benefit to Plaintiffs and would have resulted in economic benefit to Plaintiffs in the future." Respondents disrupted these relationships by ending Roumi's employment, misappropriating the DOE award, giving DOE false information, shutting down Roumi's lab, and interfering with his right to practice his occupation.

The evidence shows appellants cannot establish their interference claim. It is undisputed that appellants lacked Caltech's approval to apply for a DOE award or to represent that Caltech would contribute $150,000. When it belatedly learned of the DOE application, Caltech told appellants they could keep the award, leave Caltech and find another partner. Appellants did not keep the award or leave Caltech. Instead, they transferred the award to Caltech. The resulting Agreement was signed by Caltech and DOE. Caltech shared the cost of the Project and owns the intellectual property rights associated with it.

An impediment to appellants' claim is that the tort applies to "ordinary commercial dealings" among private entities. (*Blank, supra,* 39 Cal.3d at p. 330.) DOE is a government agency. Appellants' hope to contract with DOE " 'cannot be characterized as an economic relationship.' " (*Ibid.*)

Caltech cannot be found liable for interference in any event. "There is an important limitation to the use of [tortious interference] as a remedy for the disruption of contractual relationships. *It can only be asserted against a stranger to the relationship.* '[C]onsistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a contract does not lie against a party to the

16

contract.' " (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 262.) "[T]he same rationale should also bar prosecution of the tort of interference with prospective economic advantage against a party to the relationship from which the plaintiff's anticipated economic advantage would arise." (*Ibid.*)

As a party to the Agreement, Caltech could not interfere with it. Appellants argue, however, that they "had an economic relationship with the DOE that was broader than the initial phase of the DOE-Incubator award, which was the only thing assigned to Caltech. In other words, plaintiffs' entire relationship with DOE was not assigned, only a singular award."

Appellants rely on Roumi's declaration, in which he asserts that when DOE accepted Parthian's grant application, "I did not need Dr. Hoffmann or Caltech to complete my battery projects" because there were "several locations where I could complete my battery projects." Moreover, a DOE manager told Roumi that if initial efforts were successful, DOE "would likely provide" more funding for the Project. From this, appellants infer the existence of a prospective economic relationship with DOE.

To determine a future economic relationship, courts look to " 'a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered.' " (*Youst v. Longo* (1987) 43 Cal.3d 64, 75.)

There is no track record of regular commerce here. Appellants' hope to contract with DOE in the future speculates that DOE will continue its discretionary funding of research in appellants' field, that appellants' application would be approved, and that they could find a cost-sharing partner or pay the cost

17

themselves should they receive an award. A tort cannot be based on so many speculative, hypothetical contingencies.

Appellants failed to show an existing economic relationship with DOE or the probability of a future relationship. There is "no sufficient degree of certainty" that appellants will receive an anticipated benefit from a government agency. (*Roy Allan, supra,* 2 Cal.5th at p. 518.) Roumi did not take the DOE award to any of the "several locations" where he could complete his battery projects. He and Parthian chose to transfer the award— and the economic relationship—to Caltech. His initial efforts did not convince DOE to continue funding the Project. Appellants concede that after the Project ended, DOE denied their subsequent grant applications.

There was no showing the Project would lead to DOE opportunities for appellants who had "at most a hope for an economic relationship and a desire for future benefit." (*Blank, supra,* 39 Cal.3d at pp. 330–331; *Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 527.) After Parthian relinquished its interest in the award, there was no existing economic relationship between appellants and DOE. Respondents did not "interfere" with appellants' speculative future relationship with DOE.

### b. Section 1102.5 Claim Against Hoffmann

Roumi contends that the court erred in granting summary judgment for Hoffmann. He argues that Hoffmann is liable for violating section 1102.5, forbidding retaliation by "an employer or any person acting on behalf of the employer." The jury exonerated Caltech on this claim. By extension, Hoffmann, "*acting on behalf of*" Caltech, is not liable. There is no need for

18

statutory interpretation about personal liability to reach this conclusion.

Roumi's claim against Caltech was predicated on Hoffmann's conduct. The jury found Caltech believed Roumi disclosed to DOE that (a) Hoffmann directed him to submit a report to DOE with old or unrelated information or (b) Hoffmann or Caltech engaged in misuse of federal funding. Nonetheless, the jury found that Caltech did not violate section 1102.5 by subjecting Roumi to adverse action.

Collateral estoppel applies if: (1) an issue decided in a prior action is identical to one in the current action; (2) final judgment was entered in the prior action on the merits; and (3) the party being estopped participated in the prior action or was in privity with a party. (*Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, 874; *Alhino* v. *Starr* (1980) 112 Cal.App.3d 158, 170.)

Having lost at trial against Caltech, Roumi cannot relitigate the same claim against Caltech's employee. (*Burdette v. Carrier Corp.* (2008) 158 Cal.App.4th 1668, 1682–1683, 1689 [after losing a defamation case against an employer, plaintiff is estopped from suing employees for defamation]; *Takahashi v. Board of Education* (1988) 202 Cal.App.3d 1464, 1477 [employees acting in the scope of their employment cannot be sued for wrongful termination after their employer is absolved of the same claim].)

Hoffmann is being sued for his involvement—while acting in the course and scope of his employment at Caltech—in adverse actions against Roumi. Roumi, the party against whom the bar is being asserted, brought the action against Caltech; Parthian is in privity with Roumi, its owner. All prerequisites to asserting res judicata or collateral estoppel are satisfied. Hoffmann is entitled

19

to assert the jury's verdict for Caltech as a bar to relitigating his actions "on behalf of" Caltech under section 1102.5.

## DISPOSITION

The judgments are affirmed in both appeals. Appellants to bear costs on appeal.

**NOT TO BE PUBLISHED.**


                                              LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.