Filed 12/31/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN DOE, | H052538 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 23CV02954) |
| v. | |
| CALIFORNIA ASSOCIATION OF DIRECTORS OF ACTIVITIES, | |
| Defendant and Appellant. | |

For nearly three decades, the California Association of Directors of Activities (CADA) featured, promoted, and endorsed plaintiff John Doe as a motivational speaker to intermediate and high school students. However, in 2022, a member of a church youth group led by Doe under another name in the 1990s accused him of engaging in an inappropriate sexual relationship with a 17-year-old student in the group. After an independent, third-party investigation, CADA decided to terminate its association with Doe and, without mentioning the nature of the accusation, informed its members of the decision. Alleging that he earned his livelihood from speaking to CADA members and others referred by CADA members, Doe sued CADA and the former youth group member, asserting tort and contractual claims.

Both CADA and the former youth group member filed special motions to strike under Code of Civil Procedure section 425.16, the anti-SLAPP statute. (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 312 [noting that "SLAPP" stands for "strategic lawsuit against public participation"].) The trial court granted the

former youth group member's motion. It also concluded that the claims against CADA arose out of activity protected by the anti-SLAPP statute. However, the trial court denied CADA's motion to strike all but one of Doe's claims against it on the ground that Doe had shown a sufficient probability of prevailing to satisfy the anti-SLAPP statute.

CADA appeals the trial court's failure to strike all but one of Doe's claims against it. CADA argues that Doe failed to show that he can overcome CADA's common interest privilege defense and asserts as well that Doe's contractual claims are unenforceable based on public policy. We agree in part. As explained below, we conclude that Doe failed to show that he can overcome the common interest privilege and therefore Doe's tort claims against CADA should be stricken. In addition, to the extent that Doe's contractual claims are based on statements by CADA to its members and others, those claims are subject to the common interest privilege and should be stricken as well. However, we conclude that Doe's alleged contract with CADA is not against public policy and that, to the extent Doe's contractual claims are based on his termination, Doe has demonstrated a probability of prevailing on those claims. We express no position on whether Doe's contractual claims fail for reasons not raised below.

Accordingly, we reverse the order denying CADA's anti-SLAPP motion and direct the trial court to strike all of Doe's tort claims and his contractual claims to the extent that they are based upon CADA's communications. However, to the extent that Doe's contractual claims are based upon termination of Doe's alleged contract, the trial court's order is affirmed.

## I. BACKGROUND

### A. CADA

CADA is an association of intermediate and high school activities directors, which seeks to promote the development of leadership through student activities. CADA has over 2300 members throughout California, most of whom work as teachers or school

2

administrators in intermediate or high schools. One way that CADA seeks to promote development of student leadership is by offering camps, programs and conferences for students and their advisors. At the camps and conferences that it hosts, CADA has featured speakers or "sponsors," who appear for significantly reduced fees and in return are promoted to CADA's members, who often hire them for local programs.

## B. CADA's Relationship with John Doe

### 1. Long-Term Association

For more than three decades, CADA used and promoted Doe as a motivational speaker. According to Doe's complaint, CADA began inviting him to speak as a featured speaker at its camps and conferences in 1994. As a result of these speaking engagements, Doe allegedly became a popular and well-known speaker whom many of CADA's educator members hired to speak to students at local schools and programs. Indeed, according to Doe, CADA became his primary means of visibility, promotion, and credibility, and eventually all of Doe's clients were either CADA members or referred to him by CADA members. As a result, Doe allegedly earned hundreds of thousands of dollars a year in fees for CADA-related speaking engagements.

CADA also allegedly awarded Doe a "Lifetime [M]embership Honor" for "showing genuine interest in student activities and providing invaluable service to CADA State organizations and its members," and CADA designated him a "Copper Level Sponsor[]," thereby endorsing Doe to CADA's hundreds of schools in California and across both the United States and Canada.

CADA and Doe allegedly entered into several three-year written contracts. Doe's 2016 contract required him to make an in-kind contribution of two speaking engagements per year, and in return he received a complimentary membership, a discounted booth at CADA's state convention, discounted advertisements in the organization's newsletters, and sponsorship designations in the newsletters and other publications. Doe allegedly

3

was to have signed another similar contract with CADA in 2020, but he did not do so due to the pandemic. Nevertheless, in 2021 and 2022, Doe allegedly continued to participate as a sponsor at CADA-related events, and CADA promoted him to its members.

### 2. *The Watson E-mail and Ensuing Investigation*

In April 2022, CADA received an e-mail from Sarah Watson, a member of the general public unaffiliated with CADA. Watson told CADA that in the 1990s she had been a member of a church youth group led by Doe under a different name, and he had groomed and statutorily raped a 17-year-old student in the group. Watson also asserted that Doe abruptly resigned from the church and that church leadership lied about why he did so, though a church pastor recently admitted to Watson that the church should have reported Doe's conduct to the police.

After receiving this accusation, CADA hired an organization experienced in investigating sexual misconduct to conduct a confidential, independent investigation to verify whether Doe was the former youth group leader identified by Watson and whether he had engaged in an improper relationship while in that position.

The lawyer who conducted the investigation tried to interview the pastor who Watson said made the admission about reporting Doe, but the pastor referred the interviewer to the church's human resources director. However, the investigator was able to interview Watson and three others who were at the church at the time of the alleged incident. Each of these witnesses told the interviewer that Doe had been the leader of church's youth group under a different name. They also told the interviewer that Doe had "engaged in a relationship with and/or raped a student who was a minor" even though at the time he "was an ordained Presbyterian minister" and "was approximately 30-35 years old." (Boldface omitted.)

Watson told the interviewer that in 1991, when she was 14 years old, Doe was her youth group minister, albeit under a different name. According to Watson, other

4

members of the group openly talked about another member of the group, who was 17 years old at the time, having sex with Doe, and Doe later resigned for unspecified " 'personal reasons.' " Although at the time church leaders would not talk to Watson about what had happened, a church elder later told her that Doe had engaged in " 'inappropriate' " behavior with a student, and friends of the student later confirmed that the student had a relationship with Doe; indeed, after Doe resigned from the church and went to Hawaii, the student joined him there for two weeks.

The interviewer also spoke with Doe's successor as the leader of the youth group, who later became the church's interim head of staff. The interim head told the interviewer that Doe's relationship with the 17-year-old student was not a secret among the students, and he confirmed that, after resigning, Doe spent two weeks with the student in Hawaii at a property that parishioners allowed the church to use. The interim head also said that, at the request of the student's family, the church did not report Doe to law enforcement. The church offered Doe a process for redemption which would have required a full investigation as well as therapy, but Doe refused the offer and renounced his ordination.

The interim head also told the interviewer that, a few years ago, after Watson contacted the church about Doe's affair, the church notified the local police and Child Protective Services about the incident. Finally, the interim head expressed concern about Doe's website because in his view it contained "predatory language" concerning conducting one-on-one interviews with students.

The investigator interviewed another current church employee, the daughter of a senior pastor at the church at the time of the affair. The employee also was a close friend of Doe's former wife. According to the employee, Doe's former wife met Doe when she was a high school student and he a teacher. The employee told the interviewer that Doe's former wife left Doe almost immediately after his affair with the student in the youth

5

group and moved to another state, where she had full custody over her children with Doe. The employee also told the interviewer that, after his resignation, Doe stayed in Hawaii with the student and that several years ago the church had notified the police and Child Protective Services about Doe. Finally, the employee expressed concern about grooming language on Doe's website.

Finally, a fourth individual, who was an intern at the time of the incident and is now the chapel coordinator for a school in Pasadena, was interviewed. The coordinator told the interviewer that he knew Doe's former wife and confirmed that she divorced Doe after learning about his affair with the student in the youth group. The coordinator also said that, after the student met Doe in Hawaii, church officials began speaking of an affair between Doe and the student.

The coordinator also related a recent experience with Doe. The principal at the coordinator's school had asked him to book Doe as a speaker. Because Doe had changed his name, the coordinator initially did not recognize him. However, when he found Doe's website, the coordinator realized Doe was the former church youth group leader. The coordinator then told his principal that they could not hire Doe because Doe had been " 'in a statutory rape relationship' " and " 'can't be around our students.' " At the behest of his principal, the coordinator contacted Doe to see if he had changed but, after speaking with Doe, concluded that he had not.

Based on these interviews, Doe's books, and other evidence, the interviewer concluded that Doe was "more likely than not" the former church youth group leader identified by Watson and that, while in that position, he either had raped or had an inappropriate relationship with a minor.

### 3. *CADA's Termination of Its Relationship with Doe*

After receiving the investigative report concerning Doe, CADA's board met in a confidential closed session and decided to terminate its relationship with Doe. According

6

to CADA's president, this decision was not made lightly because Doe "was well-liked and his speeches were very popular with CADA and its attendees." The board also considered that the report concerned conduct nearly three decades ago and did not involve a student at a CADA event. However, the board ultimately decided that its duty to protect students took precedence and that it could not promote a person who in the past had an inappropriate relationship with a minor. Accordingly, CADA decided to terminate its relationship with Doe and to remove him from its sponsorship, speaker, and exhibitor lists. CADA informed Doe that it had received a complaint about him and, after an independent, third-party investigation, had decided to discontinue its relationship with him.

## C. CADA's Communications Concerning Doe's Termination

When CADA decided to terminate its relationship with Doe, it also decided to inform its educator members of the decision. In particular, CADA decided to tell its members that it had determined its relationship with Doe should be terminated after conducting an investigation into a report concerning Doe, but to release the investigative report only upon written request from a school superintendent or other entity with a legitimate interest in the subject. In addition, CADA board members were expressly instructed to refrain from discussing the details of Watson's accusation or the investigation and to refer questions to CADA's headquarters.

Accordingly, in July 2022, CADA sent its members an e-mail. The e-mail stated that CADA had received a complaint about Doe and referred the complaint for an independent third-party investigation. After reviewing the resulting report, the e-mail continued, the board determined that it was "in the best interests of CADA and the community it serves" to discontinue CADA's relationship with Doe. However, the Board stated that it did "not intend any negative or positive inference or accusations by taking this action" and "regard[ed] the nature of the complaint and the results of the

7

investigation as confidential . . . ." The e-mail also recommended that recipients "avoid speculation about and discussion of the complaint and investigator's report." Finally, the e-mail stated that inquiries about the matter should be made in writing, but that no response was promised.

One of CADA's board members received permission to share the investigative report with the Orange County Leadership Association (OCLA). Like CADA, OCLA "promote[s] positive leadership and culture on intermediate and high school campuses, and present[s] programs and conferences for educators and students." In addition, OCLA had Doe booked as a speaker at an upcoming conference. Accordingly, CADA sent a copy of the investigative report to OCLA's president but requested that the report be kept "extremely confidential" and not be shared beyond the OCLA board.

## D. The Proceedings Below

In December 2023, Doe sued both Watson and CADA. In addition to claiming defamation by Watson, he asserted claims against CADA and Watson for intentional and negligent interference with prospective advantage (which the complaint described as interference with "business expectancy"). Doe also asserted a claim against Watson and CADA for intentional infliction of emotional distress, and he asserted two claims against CADA alone under Business and Professions Code section 17200. Doe asserted additional claims against CADA alone for breach of contract and breach of the covenant of good faith and fair dealing. Finally, Doe asserted a claim against CADA and Watson for "tortious cancellation.".

In his complaint, Doe alleged that for nearly three decades CADA had featured him as a speaker at its camps and conferences, that these events had become his primary means of promotion and establishing credibility, and that all of his clients were either CADA members or referred by CADA members. Indeed, Doe alleged that CADA's "endorsements and promotion" made his career possible and that he was completely

8

reliant on CADA for his income. Doe also alleged that Watson had falsely and maliciously accused him of raping four students dating back to the 1990s, that CADA "repeated the lies propagated by Watson" to its entire membership, and that CADA encouraged its members "to have nothing further to do" with him. (Capitalization omitted.) As a result, Doe alleged, all his speaking engagements had been cancelled, and he has lost all his income.

Watson and CADA each filed a special motion to strike under the anti-SLAPP statute. In support of its motion, CADA submitted a declaration from its executive director, which described CADA's mission and relationship with its members, the investigation conducted into Watson's accusation, the decision to terminate the organization's relationship with Doe, and communication of the decision to its members. CADA argued that its decision to terminate Doe was a protected activity under the anti-SLAPP statute and that Doe's claims against it arose out of that activity. CADA also argued that Doe could not show a probability of prevailing because the common interest privilege protected the organization's communications concerning Doe and that Doe could not overcome the privilege. Finally, CADA argued that Doe could not show a probability of prevailing on his contract and covenant of good faith and fair dealing claims because California's public policy of protecting children from sexual predation rendered Doe's alleged contract with CADA unenforceable.

In opposition, Doe argued that his claims arose out of disciplinary conduct rather than speech or other protected activity. Doe also contended that he had presented sufficient evidence to establish a probability of prevailing on his claims. However, Doe did not present any evidence that CADA acted with malice or otherwise discuss Doe's defenses.

The trial court granted Watson's anti-SLAPP motion. The court concluded that Doe's causes of action against Watson arose out of her alleged accusation that Doe

9

engaged in inappropriate sexual conduct with underaged girls in the 1990s while he was a church minister, and because of society's interest in protecting minors from predators, these statements addressed a matter of public interest. In addition, while Doe presented evidence that Watson's alleged accusations were false, he failed to show a probability of prevailing on his claims because those statements were protected by the common interest privilege and he did not present any evidence that they were made with malice.

The trial court denied CADA's motion, except with respect to the "tortious cancellation" claim which it held was not cognizable. The court concluded that Doe's claims against CADA arose out of protected activity because they were based on CADA's communications with its members or its decision to not allow him to speak or have access to its clients. However, the court concluded that Doe had shown a probability of prevailing on his claims against CADA because his declaration "establishe[d] the existence of the contract, [CADA's] knowledge of it and acts to induce a breach, that the contractual relationship ended, and resulting damage." The trial court did not mention CADA's common interest privilege defense or its argument that any contract with Doe was unenforceable because it is against public policy.

CADA timely filed a notice of appeal from the trial court's order. We have jurisdiction under Civil Procedure Code sections 425.16, subdivision (i) and 904.1, subdivision (a)(13).

## II. DISCUSSION

CADA argues that the trial court should have stricken all of Doe's claims against it because Doe failed to show probability of prevailing against CADA's defenses. In addition to asserting that he established a probability of prevailing, Doe defends the decision below on the alternative ground that CADA failed to show that his claims arise out of activity protected under the anti-SLAPP statute. We review denial of a motion to strike under the anti-SLAPP statute de novo. (See, e.g., *Park v. Board of Trustees of*

10

*California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) As explained below, we conclude that all of Doe's claims against CADA arose out of protected activity and that Doe failed to establish a probability of prevailing on his tort claims or his contractual claims based on CADA's communications concerning Doe's termination. However, we conclude that, based on the issues on appeal, he has shown a probability of prevailing on his contractual claims to the extent that they are based on his termination rather than communications by CADA. Accordingly, all of Doe's claims except the contractual claims based on Doe's termination should be stricken.

## A. The Anti-SLAPP Statute

We begin by summarizing relevant aspects of the anti-SLAPP statute.

The Legislature enacted the anti-SLAPP statute "to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.]" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883-884 (*Wilson*).) The statute authorizes special motions to strike in which the merits of a party's claims are evaluated, pre-discovery in " 'a summary-judgment-like procedure.' " (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 324; see *id*. at pp. 321-322; but see Code Civ. Proc., § 425.16, subd. (g) [permitting discovery "for good cause shown"].) (Subsequent undesignated statutory references are to the Code of Civil Procedure.) If a claim "aris[es] from any act . . . in furtherance of [a] person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue," the claim should be stricken absent establishment of a " probability that the plaintiff will prevail on the merits." (§ 425.16, subd. (b)(1); see also *id*., subd. (c) [providing for attorney's fees].)

Anti-SLAPP motions are analyzed in two steps. First, "the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park*, *supra*, 2 Cal.5th at

11

p. 1061.)  Second, if the defendant satisfies its burden on the first step, the burden shifts to the plaintiff to "demonstrate its claims have at least 'minimal merit.' " (*Ibid.*)  "Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petition *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)

The defendant's burden at the first step of the anti-SLAPP analysis of showing that a claim arises from protected activity is "not always easily met." (*Equilon Enterprises, LLC v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 66.)  To satisfy this burden, a defendant must identify allegations of an activity that is in furtherance of the right of petition or free speech as expansively defined by the anti-SLAPP statute (§ 425.16, subd. (e)) and thus a " 'protected activity' " under the statute.  (*Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 760 & fn. 11.)  The defendant also must show that the claim at issue " 'arises from' " such protected activity. However, a claim does not arise from protected activity "simply because it was filed after, or because of, protected activity," much less because protected activity "provides evidentiary support or context for the claim." (*Rand Resources, Inc. v. City of Carson* (2019) 6 Cal.5th 610, 621.)  Instead, the protected activity "must 'supply elements of the challenged claims.' " (*Ibid.*; see also *Wilson*, *supra*, 7 Cal.5th at p. 884 ["To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' "].)

Although the anti-SLAPP statute allows courts to consider affidavits as well as the pleadings (§ 425.16, subd. (b)(2)), at the first step of the anti-SLAPP analysis a defendant may rely on the plaintiff's allegations alone in showing that a claim arises from protected activity.  (See, e.g., *Nirschl v. Schiller* (2023) 91 Cal.App.5th 386, 404; *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 929, 935-939.)  In addition, if a plaintiff

12

combines multiple claims into a count, each claim is analyzed separately. (*Baral v. Schnitt* (2016) 1 Cal.5th 371, 393, 369 (*Baral*).)

As noted above, if a defendant satisfies its burden on the first step of the anti-SLAPP analysis, the analysis proceeds to the second step, and the burden shifts to the plaintiff to demonstrate "a probability that [it] will prevail on the claim." (§ 425.16, subd. (b)(1).) This requirement has been interpreted to demand only a showing of " 'minimal merit.' " (*Park*, *supra*, 2 Cal.4th at p. 1061.) In determining whether a claim has minimal merit, a court "does not weigh evidence or resolve conflicting factual claims." (*Monster Energy Co. v. Schecter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*).) Instead, a court determines whether the claim is both "legally sufficient" and "factually substantiated." (*Baral*, *supra*, 1 Cal.5th at p. 396.) In other words, a plaintiff responding to an anti-SLAPP motion must show not only that it has pleaded a valid claim, but also that this claim is " ' "supported by a sufficient prima facie showing of facts to sustain a favorable judgment." ' " (*Navellier*, *supra*, 29 Cal.4th at p. 88.)

Where a defendant asserts a privilege or other defense, the plaintiff must show that it can overcome that defense. (See, e.g., *Flatley v. Mauro* (2006) 39 Cal.4th 299, 323 (*Flatley*) ["The litigation privilege is also relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing."]; see also *Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1006 (*Trinity Risk Management*) ["To defeat an anti-SLAPP motion, [the non-moving party] must overcome any substantive defenses that exist."].)

## B. The Intentional Interference Claim

We begin our analysis of Doe's tort claims with his claim for intentional interference with prospective economic advantage. As explained below, we conclude that this claim should be stricken because it arises from activity protected under the anti-

13

SLAPP statute—CADA's communications to Doe's clients allegedly slandering him based on Watson's accusations of rape—and Doe has failed to show that he can overcome CADA's common interest privilege defense.

### 1. *Protected Activity*

The Supreme Court has long recognized that, in and of itself, interfering with another's prospective economic advantage is not wrongful, and "[t]o establish a claim for interference with prospective economic advantage . . . a plaintiff must plead that the defendant engaged in an independently wrongful act." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158; see *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393.) Consequently, one element of claim for intentional, or tortious, interference is "intentionally wrongful acts designed to disrupt the [prospective economic] relationship." (*Roy Allan Slurry, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.) The wrongful acts alleged in Doe's complaint— CADA's dissemination of Watson's supposed false accusations of rape—concern an issue of public interest, at least with respect to a motivational speaker at student events. Accordingly, Doe's intentional interference claim arises out of conduct protected under the anti-SLAPP statute.

Apparently unaware of the accusation that Watson actually made to CADA, Doe alleged in his complaint that in July 2022 Watson wrote to CADA accusing him of having " 'raped' at least four students dating back to the 1990's" and that CADA "repeated the lies propagated by Watson" to its members. Doe's intentional interference claim incorporated these allegations by reference and further alleged that CADA circulated a letter "to all of [Doe's] clients" that "mischaracterized, defamed, slandered, and placed [him] in a false light." Moreover, in asserting that CADA willfully and maliciously interfered with his future economic expectations through "wrongful, illegal measures," Doe referred to the "circulation of a letter that mischaracterized and

14

slandered" him. As the only slanderous or defamatory statement alleged in the complaint was the supposed false accusation that Doe raped four students, we conclude that Doe's intentional interference claim arises from the alleged dissemination of that accusation.

Disregarding these allegations, Doe contends that his claims arise from CADA's termination of its relationship with him and communication of that decision to its members. We disagree. While the intentional interference count mentioned that CADA advised Doe's clients that CADA "was severing ties" with Doe, it did so only in passing. By contrast, the count contains three allegations that CADA "slandered" or "defamed" Doe. Moreover, as noted above, in alleging "wrongful, illegal measures" by CADA, the count pointed to CADA's circulation of a letter that "mischaracterized and slandered Plaintiff," not that CADA terminated its relationship with Doe and informed its members of that decision.

This focus on the alleged defamation rather than the termination is not surprising. Even if CADA had breached its contract with Doe by terminating him, the termination would not have satisfied intentional interference's requirement of independent wrongful conduct. (See *Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.* (2021) 71 Cal.App.5th 528, 540, as modified on den. of rehg. Dec. 2, 2021 ["[A] breach [of contract] cannot constitute independently wrongful conduct capable of giving rise to the tort of intentional interference with a prospective economic advantage."].) As we presume that Doe intended to allege a valid claim for intentional interference, we conclude that this claim arises out of CADA's alleged wrongful action: the dissemination of Watson's supposed false accusations of multiple rapes.

Dissemination of this accusation is a protected activity under the anti-SLAPP statute. The statute protects acts in furtherance of an individual's right to petition or to free speech (§ 425.16, subd. (b)(1)), which are defined broadly to include acts "in furtherance of" the exercise of the right to free speech "in connection with a public issue

15

or an issue of public interest." (§ 425.16, subd. (e).) Courts have long recognized "society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe." (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547 (*Terry*); see also *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1078-1079 (*Randi W.*) ["One of society's highest priorities is to protect children from sexual or physical abuse."].) Accordingly, accusations of inappropriate sexual relations between minors and adults involved in youth activities are "a matter of public interest." (*Terry*, at p. 1547 ["The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any minor is clearly a matter of public interest."]; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 375, as modified on den. of rehg. Aug. 4, 2011 ["[P]reventing child sexual abuse and protecting children from sexual predators are issues of widespread public interest."].) As Doe regularly spoke to students at schools, camps, and conferences, and claimed to have engaged in thousands of intimate conversations with teens, it is a matter of public interest whether Doe previously engaged in improper sexual relations with a minor.

Doe does not dispute the public interest in whether adults working with students have engaged in inappropriate sexual relations with minors. However, he contends that there is no public interest in the accusations against him because those accusations concern conduct from decades ago, and he poses no current danger of improper conduct. However, Doe regularly spoke to intermediate and high school students, he claimed to regularly conduct one-on-one interviews with students, and his website included language that may be considered to involve grooming or be predatory. As a consequence, Doe still presents a sufficient potential danger to students to create a public interest in his previous misconduct.

16

Doe also contends that there is no public interest in the accusations against him because those accusations were disseminated only to the limited audience of CADA members and the OCLA. In fact, CADA has approximately 2,370 members, and statements made to much smaller groups have been found to concern matters of public interest. (See, e.g., *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 483 [statement made to church with 550 to 1,000 members]; *Terry*, *supra*, 131 Cal.App.4th at p. 1549 [disclosure to at most 100 persons].) In addition, Doe alleges that CADA "provides access to literally millions of students" as well as parents, teachers, administrators, and others through its speaker programs. As a consequence, Doe's fitness as a speaker to this network is a matter of public interest.

We therefore conclude that Doe's intentional interference claim arises from protected activity and that CADA satisfied its burden under the first step of the anti-SLAPP analysis.

## 2. *Probability of Prevailing*

Because CADA satisfied its burden under the first step of the anti-SLAPP analysis, the burden shifts to Doe to show a probability of prevailing. As previously noted, to do so, Doe must show that he can overcome the defenses raised by CADA. (*Flatley*, *supra*, 39 Cal.4th at p. 323; *Trinity Risk Management*, *supra*, 59 Cal.App.4th at p. 1006.) With respect to Doe's intentional interference claims, CADA has asserted the common interest privilege. As explained below, the privilege applies to Doe's intentional interference claim, and although the privilege is qualified, Doe has not shown that he can overcome it and therefore has not shown a probability of prevailing.

### a. The Common Interest Privilege

The Civil Code grants a privilege for any "communication, without malice, to a person interested therein . . . by one who is also interested." (Civ. Code, § 47, subd. (c).) While most commonly asserted in defamation actions, this privilege "applies to virtually

17

all other causes of action, except malicious prosecution, based upon publication of assertedly offensive material." (*Begier v. Strom* (1996) 46 Cal.App.4th 877, 882, citing *Ribas v. Clark* (1985) 38 Cal.3d 355, 364.)

To trigger the common interest privilege, the shared interest must be more than a "mere general or idle curiosity." (*Brown v. Kelly Broadcasting Co*. (1989) 48 Cal.3d 711, 737 (*Brown*).) The interest must be a " 'more direct and immediate concern' " (*id.* at p. 736), such as " 'where the parties to the communication share a contractual, business or similar relationship' " (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1119 (*Hui*)) or the parties are professionals in a field and the communication concerns an issue of importance in the field (*Brown*, at p. 737). In addition, if there is a sufficiently direct and immediate shared interest in an issue, communication concerning that issue must be reasonably calculated to protect or further that common interest. (*Hui*, at pp. 1118-1119.)

To overcome the common interest privilege, a plaintiff must show malice. (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1203 (*Lundquist*).) Malice is shown by presenting evidence that the defendant was " ' "motivated by hatred or ill will towards the plaintiff" ' " or that the defendant " ' "acted in reckless disregard of the plaintiff's rights" ' " because he " ' "lacked reasonable grounds for [his] belief in the truth of the publication." ' " (*Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1337.) Because malice focuses on a defendant's state of mind (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 951), it may not be inferred from the mere fact that a communication was made. (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 354).

A defendant invoking the common interest privilege bears the initial burden of showing that the privilege applies to the communication in question, and, if that showing is made, the burden shifts to the plaintiff to rebut the privilege by showing malice. (*Lundquist, supra,* 7 Cal.4th at p. 1203.)

18

b. Shared Interest

CADA has shown both a shared direct and immediate concern and a communication relating to that concern.

CADA and its members share a direct and immediate concern in identifying suitable speakers and ensuring the safety of students. CADA is an association of intermediate and high school activities directors, and its mission is to promote and support student leadership development. One way that CADA accomplishes this mission is by offering conferences and programs, including summer student leadership camps, at which speakers appear. CADA's members mostly work in schools as teachers or administrators. As a consequence, CADA and its members share an interest in identifying suitable individuals to speak to students concerning leadership and in ensuring that those speakers do not abuse the students attending their speeches. (*Terry*, *supra*, 131 Cal.App.4th at pp. 1556-1557 [church members and non-members with children in the church's youth group have common interest in learning about potential abuse by youth group leaders]; *Hecimovich v. Encinal School Parent Teacher Org.* (2012) 203 Cal.App.4th 450, 471-472 [parents of student-athletes, school officials, and PTO president share common interest concerning fitness of coach].)

The communications challenged by Doe in his intentional interference claim relate to this common interest. CADA informed its members that the organization had decided to discontinue its relationship with Doe in light of its investigation of a complaint about Doe. Thus, the communication is reasonably calculated to further the shared interest of CADA and its members concerning suitable speakers, and therefore the common interest privilege applies.

The common interest privilege also applies to CADA's decision to share the investigative report with OCLA. CADA and OCLA share a common interest in identifying suitable speakers and protecting students. Indeed, CADA and OCLA have

19

similar missions—promoting positive leadership and culture on intermediate and high school campuses in part by presenting programs and conferences for students and education—with OCLA serving the Orange County area rather than the whole state. In addition, OCLA and CADA shared a direct and immediate interest in Doe's suitability as a speaker because Doe was slated to speak at an OCLA conference. Moreover, sharing the investigative report and the concerns it raised about Doe's suitability as a speaker furthered this common interest and therefore triggered application of the common interest privilege.

Doe argues that CADA's communications to its members about Doe fall outside the common interest privilege because some of those who received the communications "had no direct involvement with DOE's speaking engagements or the allegations against him." While that may be true, CADA had promoted and endorsed Doe as a speaker to all its members, and Doe himself alleged that CADA members referred him to others. Consequently, when CADA determined that Doe was not a suitable speaker, it furthered its shared interest with its members by informing them that it no longer considered Doe a suitable speaker.

Doe also contends that CADA's sharing of the investigative report with OCLA falls outside the privilege because OCLA was not a CADA member. While that is true, as explained above, OCLA nonetheless had a shared interest in identifying suitable speakers for intermediate and high school students, and sharing the investigative report concerning Doe's past misconduct with a minor furthered that interest.

Accordingly, we conclude that CADA has shown that the common interest privilege protects CADA's communications to its membership and to OCLA about Doe.

c. Malice

If a defendant establishes that the common interest privilege applies, the plaintiff may rebut the privilege by showing that the defendant acted with malice. (*Lundquist*,

20

*supra*, 7 Cal.4th at p. 1203.) Doe has not presented evidence of malice and therefore has not shown that he can overcome the common interest privilege.

The evidence presented by CADA shows that, far from acting out of ill will or with reckless disregard, CADA carefully considered Watson's accusation against Doe. It hired an organization experienced in conducting confidential investigations into sexual misconduct to determine whether Doe was the person identified in Watson's e-mail and, if so, whether the misconduct asserted by Watson occurred. After the organization concluded that Watson's accusation was more likely than not true and, in particular, that Doe likely had an improper relationship with a 17-year-old student while he led her church youth group, the CADA board carefully considered whether to continue using Doe as a speaker because he was well-liked, his speeches were popular, and the conduct occurred long ago. However, ultimately, the board decided that its duty to protect students took precedence and that it should not promote a speaker who had engaged in an inappropriate sexual relationship with a minor.

The CADA board's implementation of this decision was equally cautious. The board determined that it would share the report only upon written request from a party such as a school superintendent with a legitimate interest and only if that party agreed to keep the report confidential. CADA also instructed its board members to refrain from speaking to others about the details of the accusations against Doe or the investigation and to tell those who inquired that the board did "not intend any positive or negative inferences or accusations." The e-mail sent to CADA's members similarly stated that the board "regards the nature of the complaint and the results of the investigation as confidential, and requests and strongly recommends that you avoid speculation about and discussion of the complaint and investigator's report . . . ."

Doe contends that CADA's communications were made in reckless disregard of the truth because the investigative report upon which CADA relied was based on hearsay

21

and lacked conclusive evidence such as a conviction or direct testimony from a victim. In fact, the independent investigator hired by CADA uncovered persuasive evidence of misconduct by Doe. As the investigation showed, Doe's own books admitted that he had been a pastor at a church more than two decades ago, that he had an affair, and that his wife left him as result—facts that the witnesses interviewed confirmed. In addition, the four witnesses interviewed provided a consistent, and credible, account of Doe's misconduct. All four told the interviewer that in the 1990s Doe had used another name and that he had been a church youth group leader. Three said that Doe's affair with a student was widely known, and a slightly different set of three said that, after Doe resigned from the church, the student went to stay with Doe in Hawaii for two weeks. Two witnesses said that Doe's wife, who apparently had met him while she was a student and he a teacher, left him because of the affair, and Doe's successor as youth group leader said that Doe renounced his ordination rather than submit to a redemption process that included an investigation. And one witness said that, several years ago, he was asked to book Doe as a speaker, but told his principal that they should not because Doe had been "in a statutory rape relationship" and "can't be around our students."

While some of the witnesses' statements may have been hearsay, others such as the testimony about refusing to book Doe were not, and the witnesses' statements corroborated each other on many points. As a consequence, the evidence gathered by the investigation was strong enough to justify the Board in concluding that Doe likely had an affair with a student before renouncing his ordination as a pastor and changing his name. Certainly, the board's reliance on this investigation does not suggest any reckless disregard for the truth or Doe's rights.

Doe also objects that the investigator failed to interview any of the four alleged rape victims. However, Watson's e-mail to CADA did not accuse Doe of committing four rapes. The e-mail accused Doe only of grooming and statutorily raping one 17-year-

old student.  The contention that Watson informed CADA that Doe committed four rapes was in Doe's complaint, which was filed *after* the interviews were conducted and CADA terminated its relationship with Doe.  Moreover, in light of the evidence that the family of the student with whom Doe had an affair sought to cover up the affair, it is not surprising that the investigator did not interview the student.

Finally, Doe asserts that CADA was aware of his inappropriate behavior as a church youth group leader because he disclosed his past "short-term unfaithfulness" to CADA members in 1994 and 1996.  However, Doe does not cite any evidence supporting this assertion.  He points to his declaration, but the declaration makes no mention of any such disclosure.  Doe also points to his complaint.  It is well-settled, however, that a plaintiff cannot demonstrate minimal merit based on mere pleadings.  (See, e.g., *Monster Energy*, *supra*, 7 Cal.5th at p. 788.)

Accordingly, we conclude that Doe did not present prima facie evidence of malice and therefore failed to show that he can overcome the common interest privilege.  As a consequence, he also has failed to show a probability of prevailing on his intentional interference claim, and that claim should be stricken under the anti-SLAPP statute.

### C. Other Tort Claims

In addition to claiming intentional interference, Doe asserted four other tort claims.  Like the intentional interference claim, these tort claims are based on CADA's communications with its members. Consequently, for much the same reasons as the intentional interference claim, the claims should be stricken under the anti-SLAPP statute.

#### 1. *The Negligent Interference Claim*

In addition to intentional interference, Doe claimed negligent interference with prospective economic advantage.  One element of negligent interference is "the defendant's failure to act with reasonable care."  (*Nelson v. Tucker Ellis* (2020) 48

23

Cal.App.5th 827, 844, fn. 5; see *Venhaus v. Shultz* (2007) 155 Cal.App.4th 1072, 1077–1078.)  To satisfy this element, Doe alleged that CADA interfered with his relationships with clients by "circulating a letter" to them that "slandered and placed in false light . . . his conduct in a thirty year past relationship."  As the negligent interference claim incorporates the prior allegations in the complaint, we understand the referenced letter to be CADA's communication to its members about Doe's termination.  Consequently, CADA's negligent interference claim arises out of the same communication and, thus, the same activity protected under the anti-SLAPP statute as his intentional interference claim, and it also is subject to the common interest privilege, which, as discussed above, Doe has not shown that he can overcome.  We therefore conclude that Doe's negligent interference claims should be stricken.

### 2. The Section 17200 Claims

Doe asserted two claims for unlawful and unfair business practices under Business and Professions Code section 17200 et seq. (Section 17200).  To prevail on a Section 17200 claim, a plaintiff must prove a predicate "wrong" that is unlawful and violates another law or regulation (*Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 676), or is unfair and violates the policy or spirit of another law (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20 Cal.4th 163, 187).  In his Section 17200 claims, Doe incorporated the prior allegations in the complaint and alleged that CADA "tortiously interfered" with his business expectations.  We understand this latter allegation to refer to CADA's letter to its members that forms the basis of Doe's interference claims.  Consequently, like those claims, Doe's Section 17200 claims arise out of CADA's communications to its members which are protected under the anti-SLAPP statute and subject to the common interest privilege, and which Doe has not shown that he can overcome.  Consequently, for the same reasons as the interference claims, Doe's Section 17200 claims should be stricken.

### 3. *The Intentional Infliction Claim*

Doe's final tort claim is for intentional infliction of emotional distress. To prove such a claim, a plaintiff must show, among other things, extreme and outrageous conduct. (See, e.g., *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.) Doe alleged that CADA's conduct was "outrageous" because CADA "received, and acted upon, false allegations concerning Plaintiff's prior relationships from thirty-two years prior" and "published these lies to third parties, and to Plaintiff's present and future business clients . . . ." Thus, like his other tort claims, Doe's intentional infliction claim arises out of CADA's communications with its members, which makes it a protected activity under the anti-SLAPP statute and subject to the common interest privilege, and because he has not shown that he can overcome that privilege, this claim also should be stricken.

## D. The Contractual Claims

In addition to tort claims, Doe asserted two contractual claims: one for breach of contract and another for breach of the implied covenant of good faith and fair dealing. He alleged that CADA breached the implied covenant (1) by terminating his services without notice, warning, or opportunity to be heard and (2) by notifying CADA members and his clients of alleged lies and mischaracterizations concerning him. The allegations concerning the contract claim are vaguer: Doe merely asserted that CADA "breached the contract," "tortiously interfered" with his business expectations, and violated Section 17200 "as set forth []above." However, at oral argument, Doe acknowledged that the conduct violating the implied covenant breached the alleged contract as well. As this conduct raises multiple claims, we analyze the claims separately. (*Baral*, *supra*, 1 Cal.5th at pp. 393, 396.) We conclude that both sets of claims arise from protected activity, but that Doe satisfied his burden of showing minimal merit only under his termination theory.

25

### 1. The Communications-Based Claims

We begin with CADA's communications to its members (and Doe's clients). Doe alleged that CADA breached its contractual obligations by "notifying all of Defendant, CADA's clients and schools, and all of Plaintiff's clients and schools, of . . . lies and mischaracterizations." This is the same alleged conduct that underlies Doe's tort claims. Moreover, Doe does not dispute that the common interest privilege applies to contractual claims. Consequently, like his tort claims, Doe's contractual claims based on CADA's communications arise out of protected activity and are subject to the common interest privilege, which Doe has not shown he can overcome, and therefore the contractual claims based on those communications should be stricken.

### 2. The Termination-Based Claims

Doe's second set of contractual claims—that CADA breached its contractual obligations by terminating its relationship with him—raises more difficult questions. We conclude that, because CADA's alleged contract was to endorse Doe as a speaker, the claim based on this theory arises out of protected activity under the anti-SLAPP statute. However, we conclude that Doe has satisfied his burden of showing minimal merit.

#### a. Protected Activity

Doe contends that his contractual claims do not arise out of protected activity because CADA's termination of him involved "disciplinary conduct" rather than speech. CADA responds that Doe's termination furthered the exercise of its right to free speech and thus qualified as protected conduct under the anti-SLAPP statute. We agree with CADA. The anti-SLAPP statute defines protected activity to include "conduct in furtherance of the exercise of . . . the constitutional right to free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) CADA's termination of Doe, which withdrew CADA's endorsement and approval of him, satisfies this definition.

26

The Supreme Court has long recognized that "conduct alleged to constitute breach may also come within constitutionally protected speech or petitioning." (*Navellier*, *supra*, 29 Cal.4th at p. 92.) The anti-SLAPP statute defines protected activity to include not only written and oral statements, but also "*conduct* in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4), italics added; see also § 425.16, subd. (a) ["this section shall be construed broadly"].) Moreover, termination of a contractual relationship may further the exercise of the right to free speech. For example, when a singer terminates a drummer in the singer's band, the termination is protected activity under the anti-SLAPP statute because the "singer's selection of the musicians that play with him both advances and assists in the performance of the music." (*Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106.) Similarly, a television station's hiring of a weathercaster is protected activity because selection of on-air personnel to report news " 'help[s] advance or assist' . . . First Amendment expression." (*Hunter v. CBS Broadcasting Inc*. (2013) 221 Cal.App.4th 1510, 1521; see also *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 268-269 [selection of attorneys for prepaid legal plan is protected activity because it advances exercise of the right to petition].)

For similar reasons, CADA's termination of its relationship with Doe is protected activity because it furthered CADA's ability to control which speakers to endorse and with whom to associate. Doe alleged that CADA hired him as a "featured [s]peaker" and "featured sponsor" for leadership camps and conferences, promoted him as a motivational speaker in marketing materials and electronic advertising, included his books in its on-line bookstore, and gave him a booth at CADA conferences. In addition, by awarding Doe a "Lifetime Membership Honor" and featuring him as a "Copper Level Sponsor[]," CADA allegedly acknowledged his " 'invaluable service' " to CADA and gave Doe its "endorsement to the 'entire CADA membership.' " Thus, through its

27

relationship with Doe, CADA allegedly approved and endorsed Doe as well as his speaking and writing. While CADA did not expressly reject or denounce Doe, Doe contends that, by terminating that relationship, CADA stripped him of his lifetime membership and sponsorship, terminated his featured status, and stopped promoting his books and endorsing him as a speaker. However, in withdrawing its approval and endorsement of Doe, CADA also dissociated itself from Doe and his views, which furthered CADA's ability to express its own views. In addition, because CADA's speaker program also allegedly provides access to millions of students, its alleged endorsement of Doe is an issue of public interest. Accordingly, we conclude that CADA's termination of Doe furthered the organization's exercise of its right to free speech in connection with issues of public interest and therefore is protected activity under the ant-SLAPP statute.

In arguing otherwise, Doe relies on the Supreme Court's decisions in *Park*, *supra*, 2 Cal.5th 1057 and *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1017 (*Bonni*). Both decisions are distinguishable. In *Bonni* the Supreme Court held that discipline imposed on a doctor through a hospital peer review process was not a protected activity under the anti-SLAPP statute. (*Bonni*, *supra*, 11 Cal.5th at pp. 1004, 1019-1023.) Doe contends that CADA's termination of its relationship with him was likewise disciplinary conduct and therefore not protected activity. However, *Bonni* did not rule that disciplinary conduct can never be a protected activity. To the contrary, the Supreme Court expressly noted that its ruling that discipline of the doctor in *Bonni* was not protected activity "turn[ed] on the fact that the Hospitals have not drawn any connection between their disciplinary actions and their petitioning or speech abilities." (*Id*. at p. 1021.) Here, there is such a connection because Doe's activities involved speech-making and other expression rather than medical treatment, and CADA's termination of

28

its relationship with Doe withdrew the organization's prior approval and endorsement of him as a speaker.

For similar reasons, *Park* is distinguishable. As Doe points out, in *Park* the Supreme Court held that a university's denial of tenure to a professor is not protected activity under the anti-SLAPP statute. (*Park*, *supra*, 2 Cal.5th at pp. 1071-1073.) However, in doing so, the Supreme Court did not adopt any sweeping rule concerning disciplinary conduct. To the contrary, it noted that the university had "not explained what University expression on matters of public interest the retention or nonretention of [Park] might further." (*Id.* at p. 1072; see also *ibid.* ["[N]or has it discussed the circumstances in which a court ought to attribute the speech of an individual faculty member to the institution with which he or she is affiliated."].) Here, Doe himself provides that explanation: Through its relationship with Doe, CADA approved and endorsed him as a speaker.

We therefore conclude that CADA's termination of its relationship with Doe, and consequent withdrawal of its approval and endorsement, is protected activity under the anti-SLAPP statute. In addition, because Doe's breach of contract and covenant of good faith and fair dealing claims are based on that termination, we conclude that his contractual claims based on termination arise out of protected activity.

b. Probability of Prevailing

Because Doe's contractual claims based on termination arise out of protected activity, Doe bears the burden of showing a probability of prevailing on them. (*Park*, *supra*, 2 Cal.5th at p. 1061.) In the trial court, CADA did not dispute that Doe presented sufficient evidence to make a prima facie showing of a contractual breach. Instead, CADA argued that Doe cannot not prevail on his contractual claims because enforcement of Doe's alleged contract with CADA would force the organization to continue promoting Doe as a motivational speaker to students, which would create a risk of

29

inappropriate behavior with minors, and that risk in turn violates the public policy of protecting minors from abuse. We agree with CADA that there is such a public policy. (See, e.g., *Terry, supra*, 13 Cal.App.4th at p. 1547; *Randi W.*, *supra,* 14 Ca1.4th at pp. 1078-1079.) Nonetheless, we reject CADA's contention that in light of that policy Doe cannot enforce his alleged contract with CADA.

In the first place, there is a factual dispute concerning the danger posed by Doe. To show a probability of prevailing under the anti-SLAPP motion, a defendant need merely present evidence that, if credited, is sufficient to sustain a favorable judgment. (*Navellier*, *supra*, 29 Cal.4th at p. 89.) Here, Doe submitted a declaration denying that he raped four students as Watson allegedly asserted and also denying that he had ever been arrested or charged with rape. Doe further averred that from 1994 to 2022 he did not engage in any inappropriate relationships. If it credited this evidence, a jury could find little or no risk that Doe would engage in any sexual abuse or inappropriate conduct with the students attending his speeches and that the public policy against such abuse is inapplicable. This evidence shows the minimal merit needed in the second step of the anti-SLAPP analysis to overcome a defense based on the risk of inappropriate behavior. In reaching this conclusion, we consider only the evidence presented by Doe and "do[] not . . . resolve conflicting factual claims." (*Monster Energy*, *supra*, 7 Cal.5th at p. 788.)

In addition, there is a more fundamental problem with CADA's public policy argument. Because " ' "[f]reedom of contract is an important principle," ' " courts are "reluctant to decline enforcement of contractual provisions on public policy grounds, especially where no statute or constitutional provision directly speaks to the issue." (*EpicentRx, Inc. v. Superior Court* (2025) 18 Cal.5th 58, 75-76; see also *Jensen v. Traders & General Ins. Co*. (1959) 52 Cal.2d 786, 794 [" 'unless it is entirely plain that a contract is violative of sound policy, a court should never so declare' "].) Accordingly, as the Supreme Court recognized nearly a century ago, "courts will not compel parties to

30

perform contracts which have for their *object* the performance of acts against sound public policy . . . ." (*Takeuchi v. Schmuck* (1929) 206 Cal. 782, 786, italics added; see *Moran v. Harris* (1982) 130 Cal.App.3d 872, 918.)  However, "[t]he object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." (Civ. Code, § 1595.)  Here, Doe's alleged contract merely required CADA to "provide speaking opportunities" to Doe—not to do, or not do, anything contrary to the public policy of protecting minors from abuse.  Consequently, public policy does not bar enforcement of Doe's contract.

This conclusion is supported by the analogous rule against enforcing  illegal bargains.  (See, e.g., Civ. Code, §§ 1598-1599.)  A contract is not unenforceable merely because there are " 'some illegal features indirectly connected with a transaction.' " (*Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 776 (*Hill*); see also *Barry v. OC Residential Properties, LLC* (2011) 194 Cal.App.4th 861, 870 [" 'It is not the law that every transaction connected with an illegal transaction is itself illegal.' "]; *People v. Brophy* (1942) 49 Cal.App.2d 15, 30 ["A bargain collaterally and remotely connected with an illegal purpose or act is not rendered illegal thereby if proof of the bargain can be made without relying upon the illegal transaction."].)  To the contrary, even where there are " ' "some illegal features indirectly connected with a transaction," ' " a plaintiff may enforce a contract " ' if his cause of action is otherwise legitimate, and he can make out his case without calling to his aid the illegal agreement" ' " or transaction.  (*Hill*, at p. 776.)  Here, Doe's alleged contract required CADA to provide opportunities for speaking, and therefore Doe may establish breach without proving that his contract with CADA created any opportunity to abuse students. Consequently, even if illegal conduct were at issue, Doe's contractual claims would not be barred, which supports the conclusion that public policy should not bar enforcement either.

31

At oral argument, CADA contended that Doe's contract claims cannot succeed based solely on termination of his alleged contract with CADA because any damages from termination necessarily arose out of the failure to promote or endorse him and are barred by the common interest privilege. That is largely, but not entirely, true. In the complaint, Doe alleged that CADA promised to provide him with speaking opportunities, and in the 2020 contract asserted by Doe, CADA's primary duties were to provide speaking engagements and sponsorship designations in CADA newsletters and other publication as well as permitting him to operate a booth at the group's annual state convention, place one article per year in CADA's newsletter, purchase ads in the newsletter at a discounted rate, and use CADA mailing labels—all of which involve, in one way or another, promotion or endorsement of Doe. However, the alleged contract also required CADA to provide Doe with a complimentary "Affiliate Membership." As a consequence, Doe might be able to claim damages based on the deprivation of that particular benefit. In any event, the issue of damages under Doe's termination theory was not raised in the trial court and therefore is not properly before us on this appeal.

At oral argument, CADA also argued that it should not be required to perform any contract that it made with Doe because it was unaware of his past misconduct with a minor. Such a misunderstanding may render a contract voidable if it concerns a basic assumption under which CADA entered into the contract, the mistake was attributable to Doe, and the mistake rendered the contract unconscionable. (See, e.g., *Donovan v. RRL Corp.* (20010 26 Cal.4th 261, 281; *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1568.) In addition, rescission may be sought on the ground that a contract is "unlawful for causes which do not appear in its terms or conditions" (Civ. Code, § 1689, subd. (b)(5)) or "the public interest will be prejudiced by permitting the contract to stand" (*id.*, § 1689, subd. (b)(6)). However, CADA has not presented any argument here or in the trial court concerning either mistake or rescission, and therefore

32

we express no opinion whether those grounds would bar a claim based on termination of the contract.

We therefore conclude that, to the extent that Doe's contract and covenant of good faith and fair dealing claims are based on termination of his relationship with CADA, he has satisfied his burden under the anti-SLAPP statute, and the trial court properly denied CADA's motion to strike those claims.

## III. DISPOSITION

The order dated July 30, 2024 is reversed. On remand, the trial court is directed to strike Doe's causes of action against CADA for (1) intentional interference with business expectancy, (2) negligent interference with business expectancy, (3) violation of California Business and Professions Code section 17200—Unlawful Prong, (4) violation of California Business and Professions Code section 17200—Unfairness Prong, and (5) Intentional Infliction of Emotional Distress. In addition, the trial court is directed to strike the allegations in Doe's causes of action for breach of express contract and for breach of the implied covenant of good faith and fair dealing insofar as they are based upon communications by CADA. However, CADA's motion to strike should be denied insofar as Doe's claims for breach of express contract and the implied covenant of good faith and fair dealing are based upon CADA's termination of Doe. The parties shall bear their own costs on appeal.

33

_____
BROMBERG, J.

WE CONCUR:


_____
GREENWOOD, P. J.


_____
DANNER, J.


*Doe v. CA Association of Directors of Activities*
H052538

Trial Court:                                    Santa Cruz County
                                                Superior Court No.: 23CV02954


Trial Judge:                                    The Honorable Timothy J. Schmal


Attorney for Plaintiff and Respondent           Michael Porrazzo
John Doe:


Attorneys for Defendant and Appellant           Robert Martin Shaughnessy
CA Association of Directors of Activities:       Natalie PerrinVance


*Doe v. CA Association of Directors of Activities*
H052538